[This opinion has been published in *Ohio Official Reports* at 73 Ohio St.3d 308.]

THE STATE OF OHIO, APPELLEE, *v*. DUNLAP, APPELLANT.

[Cite as *State v. Dunlap*, 1995-Ohio-243.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 94-1777—Submitted June 6, 1995—Decided August 23, 1995.)

APPEAL from the Court of Appeals for Hamilton County, No. C-930121.

———————————

{¶ 1} On October 6, 1991, at a Cincinnati park, defendant-appellant Timothy Dunlap used a crossbow to shoot two arrows into his girlfriend, Belinda Bolanos. After Dunlap left Bolanos to die, he drove her Chevette across the country until he arrived on October 16 at Soda Springs, Idaho. There, Dunlap used a sawed-off shotgun to rob a bank and kill bank teller Tonya Crane. Idaho police captured him that afternoon. Dunlap now appeals his Ohio conviction and death sentence for the aggravated murder and robbery of Bolanos.[1]

{¶ 2} In June 1991, Dunlap traveled from Indiana to Cincinnati, where he found casual labor jobs and lived on the streets and in inexpensive motels. That summer, he met Bolanos in Cincinnati, where he worked as a temporary worker. They began dating, traveled to Florida, and in mid-September started living together in her early 1980s Chevette hatchback. In late September, Dunlap bought a crossbow and thought about killing Bolanos.

{¶ 3} On Sunday morning, October 6, 1991, Dunlap asked Bolanos to go with him for a picnic near the Ohio River. When they arrived at a river park, Dunlap told her he had a surprise for her. Dunlap described later how he "blind folded her, walked her into the woods, had the cross bow with me, shot her once in the neck,

———————

1. In Idaho, Dunlap pled guilty to Crane's murder and was sentenced to death. Upon appeal, the Idaho Supreme Court affirmed his death sentence. See State v. Dunlap (1993), 125 Idaho 530, 873 P.2d 784.

she fell to the ground, then I shot her once in the head." He shot her in the neck so "she wouldn't be able to scream." In the head, he chose "the closest place to the temple, softest part of the skull." Dunlap killed her to "get her car, credit card and checks." When he left her, he drove her Chevette to Louisville, Kentucky.

{¶ 4} In Louisville, Dunlap purchased a 12-gauge shotgun and then drove for several days through Kentucky, Missouri, Arkansas, Oklahoma, Kansas, Colorado, Utah, Wyoming, and Idaho until he arrived at Soda Springs, Idaho. Along the way, he sawed several inches off the shotgun barrel. During his journey, he assumed the fictitious name of Steve Bolanos and used Belinda's credit card to pay for gas, meals and lodging.

{¶ 5} On October 12, while Dunlap was driving across the country, Bolanos's body was discovered in the woods. The coroner found that Bolanos died as a result of wounds caused by two arrows: one arrow went through her throat almost five inches, and the other arrow, shot into the right side of her head, pierced her brain for six inches. Despite these injuries, Bolanos probably lived for fifteen to thirty minutes after she was shot.

{¶ 6} Around 9:30 a.m., October 16, Dunlap walked into a Soda Springs, Idaho bank with the sawed-off shotgun and asked teller Crane for all of her money. According to one teller, Dunlap shot Crane "as quickly as he grabbed the money." Dunlap was described as "very cool, very calm, and very collected," with "the coldest eyes." Another teller confirmed that Crane "did everything" Dunlap asked, "and he shot her for no reason." Crane died as a result of the shotgun blast to her chest. A bystander wrote down a description of Dunlap and the car including the license number.

{¶ 7} Later that afternoon, Dunlap abandoned the Chevette after a chase and escaped into nearby woods, but was later apprehended. After being advised of his *Miranda* rights, Dunlap admitted he had robbed the Soda Springs bank and shot the teller.

2

{¶ 8} During interviews on October 17 and 19, Dunlap again admitted to police that he robbed the bank and shot Crane, because "she set the alarm to the police and she didn't give me all the money." Dunlap asserted, however, he "never intended to kill her." Because he had loaded the shotgun with bird shot, he thought she would just wind up in the hospital.

{¶ 9} In the same interviews, Dunlap admitted he shot Bolanos with the crossbow in order to get her car, check book, and credit cards. Dunlap recognized "it didn't have to be done, it is just I was broke, I had no money. I was hardly working." He felt a "little bit of sadness" because "I liked her a little bit." In the October 19 interview, Dunlap also claimed that an ex-boyfriend of Bolanos gave him money to kill her, but no evidence at trial supported that assertion.

{¶ 10} On October 16, Dunlap consented to a search of the car. On October 18, police searched the Chevette and found the crossbow, the shotgun, numerous credit card receipts signed by Dunlap as "Steve Bolanos," Belinda's personal belongings, and a large quantity of loose cash.

{¶ 11} The grand jury indicted Dunlap for two aggravated murder counts relating to Bolanos, murder done with prior calculation and design (count I) and felony murder (count II), as well as aggravated robbery (count III). Each murder count included two death penalty specifications alleging murder as a "course of conduct" and murder during an aggravated robbery in violation of R.C. 2929.04(A)(5) and (7). At trial, Dunlap asked his attorneys not to challenge the prosecution's guilt-phase evidence or to cross-examine prosecution witnesses. Defense did move to suppress Dunlap's pretrial statements to police and also contested Dunlap's guilt as to the "course of conduct" death penalty specification. The jury convicted Dunlap as charged.

Evidence at Sentencing

**{¶ 12}** Dunlap's mother, Patricia Dunlap, testified that Dunlap was born in August 1968, and his stepfather adopted him in 1969. As a youth, Dunlap played sports, served as an altar boy, a school crossing guard, and a cub scout, and was in the county sheriff's cadet program. In high school, he was in several plays and played the school mascot. In two years of college, he studied business law, communications, and drama and had the lead in a college play. When he was twenty-one, he got married and had a son, but the marriage lasted less than a year. Until his divorce, he was never in trouble with the law, and he even ran for political office twice.

**{¶ 13}** John Dunlap, his stepfather, testified he was a good son, who was introverted in grade school, but he blossomed in high school. At eighteen, he was rebellious. Dunlap's grandmother spoke highly of him. His sister testified that he had few friends and started rebelling against his parents in high school. In college, Dunlap did well and loved acting. After his marriage, his wife had a child, and he was "a very loving father." He went "over the edge" when his wife divorced him less than a year later.

**{¶ 14}** His mother thought Dunlap "always had mental problems." When he was twelve, his mother took him for counseling and therapy, but that stopped when he told her, "I just can't go anymore." He reportedly had comprehension problems and a learning disability. In January 1991, police arrested Dunlap for harassing his ex-wife. After some time in jail, he was admitted at a mental health facility. That facility's records report that Dunlap was "manipulative" and prone to violence, and he had a history of depression, temper outbursts, and possible hallucinations. Those records reflect a diagnosis of disassociative disorder, intermittent explosive disorder, depressive disorder, and personality disorder with a possible partial complex seizure disorder.

{¶ 15} When released from that facility, Dunlap went back to jail and then to Madison State Hospital in Indiana. In June 1991, he escaped from Madison and went to Cincinnati. His family did not see him again until after his October 1991 arrest in Idaho.

{¶ 16} When his family first talked and met with Dunlap after his October arrest, he seemed like a different person. Dunlap's voice showed "no feeling, no warmth, no emotion." Dunlap had an unfamiliar "hideous laugh" and "cold, glaring stare." Yet his mother, sister, and grandmother all agreed that Dunlap, after time, showed remorse in jail. Dunlap told his grandmother he was sorry for what he had done and had asked God to forgive him.

{¶ 17} In an unsworn statement, Dunlap said "I am but a man who thought he was pushed to the edge of desperation, living in dire straights [*sic*]." Now, he felt "sorry for what [he's] done." As to the bank robbery, he "did not intend, calculate or design the death of the teller." When he thought she pushed the alarm, his "anger and frustration turned to rage," and he shot her. The "same pent up anger and rage led to [his] crime here in Ohio." On the streets of Cincinnati, he lived "on the razor's edge of sanity struggling every day to survive." He had nowhere to stay but in Bolanos's car. He had "very little money [and] wore the same clothes.*** The fear, anxiety, frustration and desperation ate at [him] more and more each day." He challenged the jury that "If any one of you can *** place yourself in my situation and state of mind, [and say] you would have done different, then you're simply dealing in lunacy and can't possibly say one way or the other."

{¶ 18} He told the jury, "I don't want you to think I'm trying to excuse what I've done, I am not, nor am I trying to lessen the fact that two women are dead. I'm sorry for what I've done." Further, he said, "I care about my family, my friends, and my son, and the people I hurt, and ask them to forgive me." Now, he hopes for "a chance to rehabilitate" himself in prison. "And though I took two lives, I do not deserve to die."

**{¶ 19}** In rebuttal, Dr. Michael Estess, a board-certified psychiatrist, testified via videotape that he had interviewed Dunlap and reviewed various records. In his view, Dunlap had "personality disorders," including "passive-aggressive," "histrionic" and "explosive" disorder. These disorders did not constitute a mental disease or defect, and Dunlap understood right from wrong and could conform his actions to law. Estess agreed that Dunlap might possibly have some level organic brain dysfunction, but even if that were true, it had no particular significance or relevance. Estess disbelieved Dunlap's claims of occasional blackouts or hallucinations; instead he thought Dunlap was prone to "theater," "embellishment," and even "malingering."[2]

**{¶ 20}** Also, in rebuttal, a reporter testified that he had interviewed a Tim Dunlap by phone after his Ohio arraignment. The reporter satisfied himself the caller was Dunlap because of the caller's personal knowledge. When asked about remorse, Dunlap replied, "Yeah, I've got to regret I didn't get away." In surrebuttal, Dunlap's mother testified that he was still agitated, upset, and confused when he first returned to Ohio, but he later changed and became truly sorry. More recently, Dunlap had told another reporter that he was sorry and "wished things could have turned out differently."

**{¶ 21}** After considering the evidence, the jury recommended the death penalty on both aggravated murder counts. The trial court agreed and sentenced Dunlap to death on each murder count. The court of appeals affirmed Dunlap's convictions and death penalty.

**{¶ 22}** The cause is now before this court upon an appeal as of right.

———————————

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for appellee.

---

2. The video deposition lasted one hour and seventeen minutes, but was stopped after an extensive cross-examination because of lack of tape. No issue has been raised as to that.

*Elizabeth E. Agar*, for appellant.

———————————

**PFEIFER, J.**

{¶ 23} Dunlap presents fifteen propositions of law for our consideration. We have considered Dunlap's propositions of law, independently weighed the statutory aggravating circumstances against the evidence presented in mitigation, and reviewed the death penalty for appropriateness and proportionality. Upon review, and for the reasons which follow, we affirm the judgment of the court of appeals.

## I. Admission of Confession

{¶ 24} In his twelfth proposition of law, Dunlap argues the trial court erred in failing to suppress his pretrial statements to the police. At a pretrial hearing, Dunlap testified that Idaho police officers manhandled and threatened him when they arrested him. He claimed he waived his *Miranda* rights "out of fear of what might happen" because "they were going to hurt me if I didn't say it was me." Dunlap also claimed that he requested counsel several times before interrogation, but the police ignored those requests. Dunlap admitted he signed waivers of rights and submitted to interviews on October 16, 17 and 19.

{¶ 25} Of course, if Dunlap did request counsel, and police ignored the request and continued questioning him, his statements would be inadmissible. When counsel is requested, interrogation must cease until a lawyer is provided or the suspect reinitiates the interrogation. *Arizona v. Roberson* (1988), 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704; *Edwards v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378.

{¶ 26} However, the record of the suppression hearing supports a finding that Dunlap voluntarily waived his rights and never requested to consult counsel before agreeing to be interviewed by police or while being interviewed. The October 16 interview was videotaped, and the interviews on October 17 and 19

were audiotaped. The tapes show that during hours of interviews, police readvised or reminded Dunlap of his rights several times, and he signed two separate waivers of rights. At no time during these taped interviews did appellant decline to answer questions or ask to consult a lawyer before answering questions. The police never threatened appellant or promised him anything to secure his cooperation. On October 19, appellant freely talked with Cincinnati police officers after again waiving his *Miranda* rights.

{¶ 27} Admittedly, at one point during the taping of Dunlap's October 17 statement, the police chief briefly referred to the fact that the interview had been interrupted so Dunlap could sign "a document for the Court." That document "has to do with appointing an attorney, which you [Dunlap] do not have enough funds for."

{¶ 28} However, the context makes it clear that this request concerned the appointment of counsel for future court hearings. Dunlap did not ask to consult with a lawyer before answering questions nor did he ask for a lawyer to be present during any interviews. "The rationale underlying *Edwards* is that the police must respect a suspect's wishes regarding his right to have an attorney present during custodial interrogation." *Davis v. United States* (1994), 512 U.S. 452, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362, 372. As *Davis* held, "the suspect must unambiguously request counsel." *Id.* at __, 114 S.Ct. 2355, 129 L.Ed.2d at 371. Dunlap made no unambiguous request to consult counsel. See *Connecticut v. Barrett* (1987), 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920; *United States v. Mills* (C.A.6, 1993), 1 F.3d 414. Instead, he simply took a short break to sign a document to allow the Idaho court to appoint him an attorney to represent him in future court proceedings. Thereafter, Dunlap resumed the interview with the police chief that Dunlap had himself initiated.

{¶ 29} Moreover, that break in appellant's taped October 17 confession occurred relatively late in the course of that interview—two thirds of the way

8

through, in fact. After that point in the interview, the police chief and Dunlap mostly discussed the Idaho robbery, not the Ohio murder. Since abundant other evidence established appellant's guilt of that second "course of conduct" murder, admitting the last portion of appellant's October 17 confession or even his October 19 statement, even if error, was harmless beyond a reasonable doubt.

{¶ 30} "[T]he weight of the evidence and credibility of witnesses are primarily for the trier of the facts. *** This principle is applicable to suppression hearings as well as trials." *State v. Fanning* (1982), 1 Ohio St.3d 19, 20, 1 OBR 57, 58, 437 N.E.2d 583, 584. Accord *State v. DePew* (1988), 38 Ohio St.3d 275, 277, 528 N.E.2d 542, 547.

{¶ 31} The trial court's decision to admit the statements rests upon substantial evidence. We find no basis to reverse the trial court's decision and reject the interview tapes and police officers' testimony in favor of Dunlap's claims. We reject Dunlap's twelfth proposition.

## II. Multiple Charges and Specifications

{¶ 32} In his first proposition of law, Dunlap correctly argues that the trial court erred by submitting two charges of aggravated murder to the jury for separate penalty determinations and in imposing two death sentences. Since both charges "involve the same victim, they merge." *State v. Lawson* (1992), 64 Ohio St.3d 336, 351, 595 N.E.2d 902, 913; *State v. Huertas* (1990), 51 Ohio St.3d 22, 28, 553 N.E.2d 1058, 1066.

{¶ 33} However, we find this error harmless beyond a reasonable doubt. *State v. Cook* (1992), 65 Ohio St.3d 516, 526-527, 605 N.E.2d 70, 82; *State v. Brown* (1988), 38 Ohio St.3d 305, 317-318, 528 N.E.2d 523, 538-539. Moreover, the court of appeals explicitly merged the two murder counts and approved only a single death sentence. Accordingly, we recognize that only a single death sentence remains but otherwise reject Dunlap's first proposition.

**{¶ 34}** In his second proposition of law, Dunlap argues that the trial court's submission to the jury of the R.C. 2929.04(A)(7), felony-murder death specification, in counts I and II, prejudiced his rights to a fair sentencing determination. Dunlap argues the specifications and instructions improperly multiplied the felony-murder aggravating circumstance into two aggravating circumstances as proscribed in *State v. Penix* (1987), 32 Ohio St.3d 369, 370-372, 513 N.E.2d 744, 746-747.

**{¶ 35}** As *Penix* notes, 32 Ohio St.3d at 371, 513 N.E.2d at 746, "[p]rior calculation and design is an aggravating circumstance only in the case of an offender who did not personally kill the victim." In this case, the sentencing instructions referred to whether "the offense of aggravated murder was committed while the defendant was committing aggravated robbery *or was committed with prior calculation and design ***.*" (Emphasis added.) By so doing, the instructions incorrectly described the aggravating circumstance. However, unlike the court in *Penix*, the court here did not multiply a single felony murder specification into two aggravating circumstances. The jury's findings of guilt, as well as the specifications in the indictment, correctly stated this aggravating circumstance. Dunlap did not object to the instruction. We find no plain error and reject Dunlap's second proposition. See, also, *State v. Cook*, 65 Ohio St.3d at 527, 605 N.E.2d at 82.

### III. Exclusion of Jurors

**{¶ 36}** In his third proposition, Dunlap argues that excluding jurors who could not vote for the death penalty violated his right to a jury composed of a fair cross-section of the community. However, death-qualifying a jury "does not deny a capital defendant a trial by an impartial jury." *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph two of the syllabus; *Lockhart v. McCree* (1986), 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137. Here, the record demonstrates those excluded held views which "would prevent or substantially impair the performance" of duties in accordance with the juror's "instructions and

oath." *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus, following *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841. Thus, Dunlap's third proposition lacks merit. *State v. Tyler* (1990), 50 Ohio St.3d 24, 30, 553 N.E.2d 576, 586.

### IV. Mercy Instruction

{¶ 37} In his fourth proposition, Dunlap argues the trial court erred in its penalty phase instructions by not allowing the jury to consider sympathy and by failing to instruct on mercy. However, the court properly instructed the jury to exclude sympathy. *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph three of the syllabus; *State v. Steffen* (1987), 31 Ohio St.3d 111, 125, 31 OBR 273, 285, 509 N.E.2d. 383, 396. The court also properly refused to instruct on mercy. *State v. Lorraine* (1993), 66 Ohio St.3d 414, 417, 613 N.E.2d 212, 216; *State v. Hicks* (1989), 43 Ohio St.3d 72, 78, 538 N.E.2d 1030, 1036.

### V. Sufficiency of Evidence

{¶ 38} In his fifth and sixth propositions, Dunlap argues the evidence was insufficient to establish his guilt of the R.C. 2929.04(A)(5) "course of conduct" specification alleging "the purposeful killing" or attempt to kill two or more persons. Dunlap argues he did not intend to kill Crane.

{¶ 39} In a review for sufficiency, the evidence must be considered in a light most favorable to the prosecution. *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; *State v. Davis* (1988), 38 Ohio St.3d 361, 365, 528 N.E.2d 925, 930. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.3d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶ 40} We find the evidence established that Dunlap purposefully killed Crane and thus his guilt of the "course of conduct" specification. Dunlap told Police Chief Blynn Wilcox he was angry with Crane and shot her because "she set the alarm to the police and she didn't give me all the money." One teller identified

Dunlap as standing at the counter, and she saw the shotgun barrel "stick out from the edge of the teller counter." According to her, Dunlap "did not hesitate. As soon as he had the money, he shot her." Another teller described Dunlap as "very determined" and "very deliberate," and the force was so strong Crane "was even blown out of her shoes."

{¶ 41} Dunlap's deliberate close-range firing of a shotgun at Crane's chest, whatever the type of shells, proved his intent to kill. "[A] firearm is an inherently dangerous instrumentality, the use of which is reasonably likely to produce death[.]" *State v. Widner* (1982), 69 Ohio St.2d 267, 270, 23 O.O.3d 265, 266, 431 N.E.2d 1025, 1028, followed in *State v. Seiber* (1990), 56 Ohio St.3d 4, 14, 564 N.E.2d 408, 419. Accord *State v. Johnson* (1978), 56 Ohio St.2d 35, 39, 10 O.O.3d 78, 81, 381 N.E.2d 637, 640.

## VI. Other Evidentiary Issues

{¶ 42} In his thirteenth proposition of law, Dunlap argues the trial court erred in allowing rebuttal testimony from reporter Hopkins in the mitigation phase. In a phone call, Hopkins asked the caller, who named himself Tim Dunlap, about remorse. Dunlap reportedly said, "Yeah, I've got to regret I didn't get away." In extensive voir dire, Hopkins explained why he was satisfied that Dunlap was the caller. Hence, the trial court did not abuse its discretion in allowing Hopkins to testify. "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. See, also, Evid.R. 611 and 901.

{¶ 43} The prosecutor's failure to list Hopkins as a potential witness, or to eject him from the courtroom under a witness separation order, did not mandate the exclusion of Hopkins as a witness. A rebuttal witness's name need not always be disclosed. See *State v. Howard* (1978), 56 Ohio St.2d 328, 333, 10 O.O.3d 448, 451, 383 N.E.2d 912, 915-916; *State v. Lorraine*, 66 Ohio St.3d at 422, 613 N.E.2d at 220. Moreover, the exclusion of testimony for an asserted discovery violation is

discretionary. *State v. Scudder* (1994), 71 Ohio St.3d 263, 269, 643 N.E.2d 524, 530; *State v. Wiles* (1991), 59 Ohio St.3d 71, 78, 571 N.E.2d 97, 110. Also, any error was harmless. Abundant other evidence suggests Dunlap lacked remorse, including testimony from Dr. Estess, Dunlap's family, and even Dunlap's unsworn statement.

{¶ 44} In his fourteenth proposition of law, Dunlap argues the trial court erred in admitting four gruesome photographs, including one autopsy photo and three crime scene photos. Under Evid.R. 403 and 611(A), the admission of photographs is left to a trial court's sound discretion. *State v. Jackson* (1991), 57 Ohio St.3d 29, 37, 565 N.E.2d 549, 559; *State v. Maurer* (1984), 15 Ohio St.3d 239, 264, 15 OBR 379, 401, 473 N.E.2d 768, 791. We are satisfied the trial court did not abuse its discretion in admitting these photographs. See *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267, 273; *Maurer*, at paragraph seven of the syllabus Thus, we reject both propositions.

## VII. Constitutional Issues

{¶ 45} In his eighth proposition, Dunlap challenges the constitutionality of the felony-murder provisions in Ohio's death penalty statute. However, we have long rejected those claims. See *State v. Henderson* (1988), 39 Ohio St.3d 24, 528 N.E.2d 1237, paragraph one of the syllabus. See, also, *Lowenfield v. Phelps* (1988), 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568; *State v. Benner* (1988), 40 Ohio St.3d 301, 306, 533 N.E.2d 701, 708.

{¶ 46} We rejected challenges such as Dunlap's ninth proposition in *State v. Beuke* (1988), 38 Ohio St.3d 29, 38-39, 526 N.E.2d 274, 285. See, also, *State v. Bedford* (1988), 39 Ohio St.3d 122, 132, 529 N.E.2d 913, 923; *State v. Sowell* (1988), 39 Ohio St.3d 322, 335-336, 530 N.E.2d 1294, 1308-1309. Dunlap's tenth proposition also lacks merit. See *State v. Jenkins*, 15 Ohio St.3d at 176, 15 OBR at 321-322, 473 N.E.2d 278-279; *State v. Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, at paragraph one of the syllabus.

## VIII. Other Sentencing Issues

**{¶ 47}** In his seventh proposition, Dunlap correctly argues the trial court erred by allowing the prosecutor to improperly refer to the nature and circumstances of the offense as aggravating circumstances. Admittedly, "the nature and circumstances of an offense are not a statutory aggravating circumstance and cannot be considered as such." *State v. Lott* (1990), 51 Ohio St.3d 160, 171, 555 N.E.2d 293, 304; *State v. Davis*, 38 Ohio St.3d at 370-371, 528 N.E.2d at 934.

**{¶ 48}** However, we find any error harmless, since the prosecutor's misstatement did not materially prejudice Dunlap. The trial court's sentence instructions explained to the jury the weighing process and the aggravating circumstances, and these instructions negated the prosecutor's misstatements. See *State v. Greer* (1988), 39 Ohio St.3d 236, 251, 530 N.E.2d 382, 400. "Moreover, the prosecutor could legitimately refer to the nature and circumstances of the offense, both to refute any suggestion that they were mitigating and to explain why the specified aggravating circumstance *** outweighed mitigating factors." *State v. Combs* (1991), 62 Ohio St.3d 278, 283, 581 N.E.2d 1071, 1077. See, also, *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus.

**{¶ 49}** In his eleventh proposition, Dunlap argues the trial court erred in not requiring the jury, as he requested, to articulate the method by which the jury weighed the aggravating circumstances against mitigation evidence. In effect, Dunlap argues that the jury should make special findings and justify their sentencing verdict.

**{¶ 50}** However, the Constitution does not require a jury in a capital case to render a special verdict or special findings. See *State v. Jenkins*, 15 Ohio St.3d at 212, 15 OBR at 352, 473 N.E.2d at 306; *Hildwin v. Florida* (1989), 490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728. Additionally, the General Assembly mandated special findings from the jury as to aggravating circumstances in R.C. 2929.03(B).

However, the General Assembly did not require the jury to explain its findings in the sentencing recommendation. Hence, we reject this proposition.

### IX. Reservation of Issues

{¶ 51} In his fifteenth proposition, Dunlap asks this court to consider other trial errors which may exist even though he failed to argue or specify such errors. However, absent plain error, Dunlap waived any such issue by not raising them here and in the court of appeals. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364. In any event, we find no plain error that is so grievous that "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, at paragraph two of the syllabus. Proof of Dunlap's guilt from his statements and the results of the car search was compelling. Our independent reassessment of the sentence will negate the effect of any unasserted error affecting the sentence.

### X. Independent Sentence Assessment

{¶ 52} After independent assessment, we find the evidence clearly proves the aggravating circumstances for which Dunlap was convicted, *i.e.*, murder during a robbery and as a "course of conduct" in purposefully killing or attempting to kill more than one person. As to possible mitigating factors, we find nothing in the nature and circumstances of the offense to be mitigating. Dunlap lured his girlfriend to a secluded park area, blindfolded her, and promised her a surprise. Then, he led her into the woods and cruelly shot her twice with a crossbow. He left her to die alone, and killed her simply to secure her possessions: an old car, credit cards, and checkbook.

{¶ 53} Dunlap's history and background provide modest mitigating features. However, his childhood and life as a young adult are mostly unremarkable. He had the advantages of a stable home, loving parents, and a solid education. Although regularly employed, he did not keep jobs very long. Unfortunately, an early marriage turned sour in its first year, and he became

entangled in courts and mental hospitals. After living homeless in Cincinnati, he turned on Bolanos, who had befriended him. Dunlap denied use of drugs or excessive use of alcohol. His admitted personality disorders, confirmed by hospital records and Dr. Estess's testimony, provide only slight mitigation. Additionally, the fact he has a son and a family who love him deserves some weight. Yet, we find nothing in his character to be mitigating.

{¶ 54} The statutory mitigating factors of age and lack of a significant criminal history are relevant and deserve modest weight. See R.C. 2929.04(B)(4) and (5). Dunlap had no criminal convictions prior to this offense. Although Dunlap was twenty-three at the time of the offense, he did have some college and was mature.

{¶ 55} We find no other applicable statutory mitigating factors in R.C. 2929.04(B)(1) to (6). His "personality disorders" were not a mental disease or defect as Dr. Estess confirmed. See R.C. 2929.04(B)(3); *State v. Fox* (1994), 69 Ohio St.3d 183, 192, 631 N.E.2d 124, 131-132. As to "other factors," in R.C. 29292.04(B)(7), Dunlap's cooperation with police was mitigating evidence. However, no significant "other factors," as specified in R.C. 2929.04(B)(7), are relevant. His personality disorders have already been considered as part of his background. Some evidence exists that Dunlap expressed remorse, but other evidence, including his unsworn statement, contradicts his claims of remorse. Under the circumstances, we assign little weight to Dunlap's remorse.

{¶ 56} In our view, the aggravating circumstances outweigh the modest mitigating factors present in this case beyond any reasonable doubt. Dunlap killed Bolanos to rob her, and he robbed her using treachery and extreme violence. Then, he stole her car, assumed the identity of her fictitious husband, Steve Bolanos, and used her credit cards to travel across the country. In Idaho, he killed another woman, thus establishing the calculated "course of conduct." Even when

considered collectively, the mitigating factors he raises deserve only modest weight and offer no redeeming value. Thus, we find the death penalty is appropriate.

{¶ 57} We find the death penalty in this case is neither excessive nor disproportionate when compared with the penalty imposed in similar cases of felony murder. See *State v. Loza* (1994), 71 Ohio St.3d 61, 641 N.E.2d 1082; *State v. Woodard* (1993), 68 Ohio St.3d 70, 623 N.E.2d 75; *State v. Green* (1993), 66 Ohio St.3d 141, 609 N.E.2d 1253; *State v. Mills* (1992), 62 Ohio St.3d 357, 582 N.E.2d 972. We further find the death sentence proportionate when compared with similar "course of conduct" murders. See *State v. Loza*, *supra*; *State v. Grant* (1993), 67 Ohio St.3d 465, 620 N.E.2d 50; *State v. Lorraine*, 66 Ohio St.3d 414, 613 N.E.2d 212; *State v. Hawkins* (1993), 66 Ohio St.3d 339, 612 N.E.2d 1227; *State v. Montgomery* (1991), 61 Ohio St.3d 410, 575 N.E.2d 167; *State v. Frazier* (1991), 61 Ohio St.3d 247, 574 N.E.2d 483; *State v. Combs*, 62 Ohio St.3d 278, 581 N.E.2d 1071.

{¶ 58} Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, WRIGHT, RESNICK, F.E. SWEENEY and COOK, JJ., concur.

_____