[Cite as *State v. Harper*, 2024-Ohio-4981.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. Patricia A. Delaney, P.J.<br>Hon. William B. Hoffman, J. |
| Plaintiff-Appellee | Hon. Craig R. Baldwin, J. |
| -vs- | Case No. 2023CA00153 |
| JAMAARI HARPER | |
| Defendant-Appellant | O P I N I O N |

CHARACTER OF PROCEEDINGS: Appeal from the stark County Court of Common Pleas, Case No. 2023 CR 0347

JUDGMENT: Affirmed

DATE OF JUDGMENT ENTRY: October 11, 2024

APPEARANCES:

For Plaintiff-Appellee

KYLE L. STONE
Prosecuting Attorney
Stark County, Ohio

VICKI L. DeSANTIS
Assistant Prosecuting Attorney
Appellate Division
110 Central Plaza, South, Suite 510
Canton, Ohio 44702-1413

For Defendant-Appellant

DONOVAN R. HILL
122 Market Avenue, North
DeWalt Building, Suite 101
Canton, Ohio 44702

*Hoffman, J.*

**{¶1}**  Defendant-appellant Jamaari Harper appeals the judgment entered by the Stark County Common Pleas Court convicting him following jury trial of murder (R.C. 2903.02(B)(D), R.C. 2929.02(B)) with a firearm specification, felonious assault (R.C. 2903.11(A)(2)(D)(1)(a)) with a firearm specification, and aggravated robbery (R.C. 2911.01(A)(1)(C)) with a firearm specification, and sentencing him to an aggregate term of 29-33 years to life in prison. Plaintiff-appellee is the State of Ohio.

### STATEMENT OF THE FACTS AND CASE

**{¶2}**  On February 5, 2023, the victim went to his girlfriend's house on Dueber Avenue in Canton, Ohio, to help her with household chores due to her recent back surgery.  The victim and his girlfriend got up early on February 6, 2023, and the victim left the house around 4:45 a.m.  The victim was carrying a hamper of laundry and told his girlfriend, M.H., to lock the door behind him.

**{¶3}**  Shortly after the victim left, M.H. heard pounding at her door.  When she opened the door, the victim, who had been shot in the throat, stumbled inside.  M.H. attempted to apply pressure to the wound while calling 911.  Emergency personnel arrived and the victim was taken to the hospital, where he died from the gunshot wound.

**{¶4}**  On the day of the shooting, Hanna Smith worked for the Canton Police Department as a civilian crime analyst within the city's Real Time Crime Center.  Ms. Smith was able to access all of the city's cameras to provide case support to police.  She received a phone call from a police officer, who had reviewed footage from a Ring doorbell camera, stating a suspect was on foot traveling north or west from the scene of the shooting.  Ms. Smith was able to spot a subject running on 9th Street, crossing over Dueber Avenue, around 5:00 a.m.  Ms. Smith then reviewed earlier footage from the

cameras in the area. Ms. Smith observed a subject exit 816 Dueber Avenue, Apartment B, at 4:44 a.m. The subject walked between 816 Dueber and 812 Dueber, traveled east out of camera view, then traveled south on Hafer Court. Around the time of the 911 call, the subject ran east across Dueber, north on Hafer Court, came between 816 and 812 Dueber, paused for several minutes as police drove through the area, then went back inside 816 Dueber Avenue, Apartment B. Using camera footage from a nearby church, officers could see a person shining a light inside the victim's car just before the victim came out of M.H.'s apartment.

{¶5} Officers obtained a search warrant for 816 Dueber, Apartment B, where Appellant's father resided. On the date in question, Appellant, his girlfriend, and his child were visiting from Cleveland. As police surrounded the home, a man later identified as Appellant jumped from a second story window and fled on foot. Appellant was apprehended by a K-9 officer. In the apartment, officers found a small bag containing several pairs of jeans, an ID card issued to Appellant's brother, two debit cards issued to Appellant, and a firearm.

{¶6} Appellant suffered a compound ankle fracture in the jump from the second-story apartment. Detective Michael Walker of the Canton Police Department went to the hospital and interviewed Appellant. Appellant admitted owning the firearm found in the bag, but claimed he had not left the apartment that morning.

{¶7} Later analysis revealed a cartridge found at the scene of the shooting was fired by the firearm found in Appellant's bag. Gunshot residue analysis revealed residue on the back of both of Appellant's hands. Further, DNA analysis revealed Appellant was a contributor to DNA found on the firearm.

{¶8} Appellant was indicted by the Stark County Grand Jury with murder, felonious assault, and aggravated robbery. Appellant moved to suppress the statements he made to police at the hospital. The trial court overruled the motion in part, finding Appellant initially waived his *Miranda* rights. The trial court found Appellant later revoked his waiver and asserted his right to remain silent, and therefore sustained the motion to suppress statements made to the officer after that point in time.

{¶9} The case proceeded to jury trial in the Stark County Common Pleas Court. Appellant was convicted on all charges. The trial court merged the felonious assault conviction and its accompanying firearm specification into the murder conviction. The trial court sentenced Appellant to a term of incarceration of fifteen years to life for murder, to be served consecutively to the mandatory three-year sentence of incarceration for the accompanying firearm specification. The trial court sentenced Appellant to eight years incarceration for aggravated robbery, to be served consecutively to the three-year mandatory sentence for the accompanying firearm specification, and consecutively to the sentence imposed for murder, for an aggregate term of incarceration of 29-33 years to life. It is from the November 2, 2023 judgment of the trial court Appellant prosecutes his appeal, assigning as error:

I. THE TRIAL COURT ERRED IN FAILING TO SUPPRESS APPELLANT'S STATEMENTS TO DETECTIVE WALKER BECAUSE THEY WERE OBTAINED IN VIOLATION OF APPELLANT'S CONSTITUTIONAL PRIVILEGE AGAINST SELF-INCRIMINATION AND

RIGHT TO COUNSEL AS APPELLANT DID NOT KNOWINGLY AND INTELLIGENTLY WAIVE THESE RIGHTS.

II. APPELLANT'S CONVICTION WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

I.

**{¶10}** In his first assignment of error, Appellant argues the trial court erred in failing to suppress the statements he made to Detective Walker because he did not knowingly and intelligently waive his *Miranda* rights.

**{¶11}** Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside,* 2003-Ohio-5372, ¶ 8. When ruling on a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and to evaluate witness credibility. *See State v. Dunlap*, 1995-Ohio-243; *State v. Fanning*, 1 Ohio St.3d 19, 20 (1982). Accordingly, a reviewing court must defer to the trial court's factual findings if competent, credible evidence exists to support those findings. *See Burnside, supra; Dunlap, supra; State v. Long*, 127 Ohio App.3d 328, (4th Dist. 1998); *State v. Medcalf,* 111 Ohio App.3d 142, (4th Dist. 1996). However, once this Court has accepted those facts as true, it must independently determine as a matter of law whether the trial court met the applicable legal standard. *See Burnside, supra, citing State v. McNamara,* 124 Ohio App.3d 706, (4th Dist. 1997); *See, generally*, *United States v. Arvizu*, 534 U.S. 266 (2002); *Ornelas v. United States,* 517 U.S. 690, (1996). The application of the law to the trial court's findings of fact is subject to a de novo standard of review. *Ornelas, supra.* Moreover, due weight should be given "to inferences drawn

from those facts by resident judges and local law enforcement officers." *Ornelas, supra* at 698.

{¶12} "When a suspect is questioned in a custodial setting, the Fifth Amendment requires that he receive *Miranda* warnings to protect against compelled self-incrimination." *State v. Wesson*, 2013-Ohio-4575, ¶ 34 (2013); *Miranda v. Arizona,* 384 U.S. 436, 478–479 (1966). However, "a suspect may then knowingly and intelligently waive these rights and agree to make a statement. If a defendant later challenges a confession as involuntary, the state must prove a knowing, intelligent, and voluntary waiver by a preponderance of evidence." *Id.*, *citing Miranda* at 475; *Colorado v. Connelly*, 479 U.S. 157, 168–169 (1986). To determine whether a valid waiver occurred, courts should "consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *Wesson* at ¶ 35.

{¶13} Detective Walker interviewed Appellant in the hospital, prior to Appellant being administered narcotics or other pain medication. The detective notified Appellant he was not under arrest, but he needed to read Appellant his rights. After reading Appellant his rights, the detective asked Appellant if he wanted to talk. Appellant was unsure, and answered "no" when asked if he had ever been read his rights before. The detective asked Appellant to read the waiver form out loud. Appellant stated he did not know what the word "constitutional" was. He also pronounced the word "waive" as "waivey." Interview Tr. 4. When the detective asked Appellant if he understood what "waive these rights" meant, the following colloquy ensued:

HARPER: Read me my rights and I understand everything you told me?

WALKER: Yeah.  And you…you're going to…you wish to engage in a conversation with me.  You never give up your rights.  Okay?  It doesn't mean by waiving you're gonna give up your rights.  It just means that you…I've read you these rights.  You're…and that you agree to have a conversation with me.  And that's gonna be…and the reason I do it by tape is so no one can say later that you…

HARPER: That we didn't have a con…

WALKER: Or that you said something.  I said oh you said this and you really didn't.

**{¶14}** Interview Tr. 4.

**{¶15}** The trial court found Appellant's waiver to be voluntary, knowing, and intelligent:

Upon a review of the totality of the circumstances surrounding his statement with Det. Walker, the Court finds that Harper knowingly, voluntarily, and intelligently waived his *Miranda* rights.  The Court finds that Det. Walker accurately advised Harper of his rights prior to questioning him, and that Harper affirmatively stated that he understood those rights (see pg. 2, "Exhibit 2A").  Further, although Harper was in the hospital at the time of the statement, there has been no evidence presented that he was under the

influence of any medication that would impact his ability to understand those rights. Moreover, while Harper indicated that he was in pain at the time of the interview, upon a review of the recorded statement, the Court does not find that any pain interfered with his ability to understand his rights and to waive them. Additionally, there was no evidence presented that Det. Walker physically deprived, mistreated, threatened, or induced Harper into speaking with him.

The Court has considered the inartful explanation by Det. Walker to Harper of his right to revoke the waiver of his *Miranda* rights during their conversation in its review of the totality of the circumstances. Although the Court finds such explanation unnecessarily complicated, the Court finds that Harper, in fact, understood his right to revoke the waiver as he ended the conversation with Det. Walker, as discussed infra.

Additionally, the Court has considered the fact that Harper stated that he had never been read his rights before and that he had difficulty in reading the written waiver form. However, after a review of all his conduct during the interview, the Court finds that Harper made a knowingly, voluntary, and intelligent waiver of his Miranda rights when speaking with Det. Walker.

**{¶16}** Judgment Entry, August 2, 2023, p. 5-6.

**{¶17}** We agree with the trial court the pain experienced by Appellant did not interfere with his ability to understand and waive his rights. We agree with the trial court Appellant's difficulty in reading the words on the waiver form did not render his waiver

invalid. We also agree with the trial court Det. Walker's explanation of Appellant's right to revoke the waiver was inartful and unnecessarily complicated. We further find the detective's statement to Appellant he was not giving up his rights by waiving them was potentially misleading, and not automatically cured by the fact Appellant eventually revoked his waiver and declined to speak further with the detective. From the recording and transcript of the interview, it is unclear if Appellant truly understood his right to revoke the waiver or simply terminated the interview because he was tired.

**{¶18}** However, assuming *arguendo* the trial court erred in admitting the portion of the statement made before Appellant revoked his waiver, we find any error was harmless.

**{¶19}** Crim.R. 52(A) defines harmless error in the context of criminal cases and provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Under the harmless-error standard of review, "the government bears the burden of demonstrating that the error did not affect the substantial rights of the defendant." *State v. Perry,* 2004-Ohio-297, ¶ 15, *citing United States v. Olano,* 507 U.S. 725(1993).

**{¶20}** Appellant did not confess in the interview. He told Detective Walker he did not leave the apartment that morning until he jumped from the second floor and was apprehended by officers. He admitted there was a gun in the bag he brought to his father's apartment. However, there was evidence two debit cards belonging to Appellant were found in the bag, and Appellant's father testified Appellant came to the apartment with a small bag, so Appellant's admission of ownership was cumulative. Video pieced from cameras in the area showed a person traveling from the apartment to the scene of

the shooting, and back to the apartment from which Appellant eventually jumped to the ground. Appellant's father testified the only people in the apartment were himself, his wife, Appellant, Appellant's girlfriend, and Appellant's baby, and the only way in and out of the apartment was through the entrance the person on the video is seen entering and exiting. The shell casing found on the crime scene matched Appellant's firearm, and Appellant had gunshot residue on the back of both hands. We find any potential error in admitting Appellant's statement to Detective Walker was harmless.

**{¶21}** The first assignment of error is overruled.

II.

**{¶22}** In his second assignment of error, Appellant argues the judgments of conviction are against the manifest weight of the evidence because the evidence did not identify him as the person who shot the victim beyond a reasonable doubt.

**{¶23}** In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 1997-Ohio-52, *quoting State v. Martin*, 20 Ohio App. 3d 172, 175 (1st Dist. 1983).

**{¶24}** Appellant argues the video evidence presented did not show distinguishing features of the shooter. He argues there were several gaps in the video, during which someone could have entered or left the apartment other than Appellant. He argues even if he was the person spotted in the videos, he might have left the house for fresh air or to

use drugs, and if he went outside to use drugs, it was reasonable he would hide from police cars upon running back to the house.  He argues the crime lab witness who testified the casing found at the scene matched Appellant's weapon did not explain why she only looked at two out of four identifying marks, and did not compare the casing to another firearm.  He argues the gun light found at the scene was not compatible with his firearm, and it is possible he had gunshot residue on his hands for reasons other than firing the weapon the morning of February 6.  Finally, he argues he had warrants and was facing prison time, providing a valid explanation other than shooting the victim for why he jumped out the window when police arrived at the home.

**{¶25}**  Officers and police support staff were able to piece together the path of a person traveling from the apartment where Appellant was staying, to the scene of the shooting, and back to the apartment.  The jury saw footage from the day before the shooting in which Appellant's father identified Appellant, providing a comparison as to body type with the person spotted in the videos from the morning of the shooting.  Although there were gaps in the videos possibly caused by connectivity issues, Appellant's father testified no one other than himself, his wife, Appellant, and Appellant's girlfriend and baby were in the apartment, and the apartment had no other entrance than the one shown on the video.  Although there are other possible explanations why Appellant might be out early in the morning and might have hid from police responding to the shooting, it is also reasonable for the jury to conclude Appellant hid from police because he was the shooter, particularly in combination with evidence gunshot residue was found on Appellant's hands and the casing found at the scene matched Appellant's

firearm. There is no evidence in the record to support his argument he went outside to use illegal drugs.

{¶26} Although the State's witness from the crime lab did not explain why she compared only two of four identifying marks, she testified only the firearm taken from Appellant's bag would have left the identifying marks from the breech face and the firing pin on the spent casing. Although the weapon light at the scene did not match Appellant's firearm, in the video a person can be seen shining a light inside the victim's vehicle, which provides an explanation for the light's presence at the scene. Further, while Appellant argues he jumped out the window to flee because he had outstanding warrants, there Is no evidence in the record to support that he had outstanding warrants. While Appellant told Detective Walker he jumped from the window because he is afraid of police, he did not state he had outstanding warrants.

{¶27} The State presented evidence a person left the apartment where Appellant was staying shortly before the shooting, followed this person via pieced together video from various cameras throughout the city to the scene of the shooting, and followed the suspect back to the apartment. The person is seen hiding from police cars responding to the shooting prior to re-entering the apartment. When police arrived at the scene hours after the shooting, Appellant jumped out a second-story window and fled on foot. A firearm found in Appellant's bag, along with two debit cards issued to Appellant, matched the spent casing found at the scene of the shooting. While it is not surprising Appellant's DNA was found on his own firearm, gunshot residue was also found on the back of Appellant's hands. From all the evidence presented at trial, we find the jury did not lose its way in finding Appellant was the person who shot the victim on February 6, 2023.

**{¶28}** The second assignment of error is overruled.

**{¶29}** The judgment of the Stark County Common Pleas Court is affirmed.


By: Hoffman, J.

Delaney, P.J.  and

Baldwin, J. concur