[Cite as *State v. Covert*, 2011-Ohio-4713.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,           CASE NO.  13-11-02

      v.

SETH A. COVERT,                  O P I N I O N

      DEFENDANT-APPELLANT.

STATE OF OHIO,

      PLAINTIFF-APPELLEE,            CASE NO. 13-11-03

      v.

SETH A. COVERT,                  O P I N I O N

      DEFENDANT-APPELLANT.

**Appeals from Tiffin Municipal Court**
**Trial Court No. CRB 1001024AB**

**Judgments Affirmed**

**Date of Decision:   September 19, 2011**

**APPEARANCES:**

    *Richard A. Kahler* **for Appellant**

    *Richard H. Palau* **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant, Seth Covert ("Covert"), appeals two judgments of the Municipal Court of Tiffin, Ohio, filed on January 28, 2011. In the first appeal (Appellate Case No. 13-11-02), the trial court found him guilty of possession of drug paraphernalia in violation of R.C. 2925.14(C)(1), a misdemeanor of the fourth degree, and sentenced him to one year of non-reporting probation, thirty days in jail, all of which were suspended, assessed a $150.00 fine and court costs, and suspended his license for six months. In his second appeal (Appellate Case No. 13-11-03), the trial court found Covert guilty of possession of marijuana in violation of R.C. 2925.11(A), a minor misdemeanor, and ordered him to pay a fine of $100.00 and court costs, and suspended his license for six months.

{¶2} The facts relevant to these appeals are as follows. On November 13, 2010, at approximately 7:00 p.m., Officer Eric Aller of the Tiffin Police Department witnessed a motor vehicle that was traveling without using its headlights. Officer Aller initiated his overhead lights, signaling the driver to stop. The driver of the vehicle pulled inside the parking lot of a gas station, and Officer Aller approached the vehicle. Inside the vehicle were the driver, a female passenger in the front passenger seat, and three male passengers in the back. Covert, one of the backseat passengers, was seated directly behind the driver.

When Officer Aller advised the driver of the reason he stopped him, the driver stated that he simply forgot to turn on his lights.

{¶3} Officer Aller asked all of the occupants for identification and they complied, including Covert. Officer Aller then asked his dispatcher to verify each person's identification through the computerized LEADS system. This check revealed that there was a misdemeanor warrant out of Hancock County for the female passenger. In addition, the dispatcher advised Officer Aller that the driver had a prior drug arrest. According to Officer Aller, this information raised concerns to him that the driver could possibly still be using drugs or possibly be operating his vehicle while under the influence of drugs, which caused Officer Aller to pay closer attention to him.

{¶4} Officer Aller had the driver exit the vehicle, and he asked him about the prior drug arrest and whether there was anything illegal in the vehicle. The driver explained that he did not live that type of life any longer and that to his knowledge there was nothing illegal in his car. Officer Aller then asked the driver if he had any problem with Officer Aller searching his vehicle, and the driver gave his consent for Officer Aller to search the car.

{¶5} Before searching the vehicle, Officer Aller patted down the driver in order to ascertain whether he had any weapons on him. He did not, and Officer Aller had him step to the back of the vehicle where another patrolman, Officer

Chandler, who had stopped to assist Officer Aller, waited. Officer Aller then began having the backseat passengers exit the vehicle one at a time. Each passenger was patted down for weapons and asked to step back to where Officer Chandler was located. Covert, who was seated directly behind the driver, was the second occupant to exit the vehicle.

{¶6} Prior to patting down Covert, Officer Aller told him that he was going to pat him down for weapons for officer safety. While he was patting down Covert, a third officer, Officer Watson, arrived on the scene. During the pat down of Covert, Officer Aller asked him if he could place his hands inside of Covert's pockets. Covert consented to this request, and inside of his pockets, Officer Aller found two metal pipes and a light film canister that contained marijuana. Covert told Officer Aller that he had forgotten that those items were in his pocket and that he had been smoking marijuana to help him deal with some stress caused by a family member dying. Officer Aller confiscated these items, finished patting down Covert, and then had him stand with Officer Watson while he continued patting down the remaining occupants and searched the car.

{¶7} None of the remaining occupants had any weapons or contraband on them. A search of the vehicle also revealed no weapons or contraband. After searching the car, Officer Aller confirmed through the Findlay Police Department that the warrant for the female passenger was still in effect and placed her under

arrest. Officer Aller also issued the driver a warning for the headlight violation, issued citations to Covert for possession of marijuana and possession of drug paraphernalia, and released all four of the men.

{¶8} Both charges were filed in the Tiffin Municipal Court and assigned individual case numbers. Covert made his initial appearance for these charges on November 15, 2010. He requested a continuance, which was granted, and the matter was rescheduled for November 22, 2010. At that time, Covert pled no contest in both cases. The trial court found him guilty of both charges and sentenced him. However, on December 2, 2010, Covert filed motions in both cases to permit him to withdraw his pleas of no contest. The trial court granted these motions, and on December 16, 2010, Covert pled not guilty to the two charges. One week later, Covert filed motions to suppress in both cases, and a hearing was held on these motions on January 11, 2011. The trial court overruled the motions to suppress on January 25, 2011. Three days later, Covert entered pleas of no contest in both cases, was found guilty, and sentenced accordingly. This appeal followed, and Covert now asserts one assignment of error for our review.

**THE TRIAL COURT ERRED IN OVERRULING THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE.**

{¶9} In his brief to this Court, Covert does not challenge the legality of the vehicle stop, whether Officer Aller was permitted to check the identification of all of the occupants, or whether the driver's consent to search the vehicle was valid. Rather, Covert contends that Officer Aller violated his Fourth Amendment rights to be free from unreasonable searches and seizures by patting him down and placing his hand in Covert's pockets where the marijuana and pipes were located.

{¶10} Initially, we note that appellate review of a decision on a motion to suppress evidence presents a mixed question of law and fact. *State v. Bressler*, 3rd Dist. No. 15–05–13, 2006–Ohio–611. At a suppression hearing, the trial court assumes the role of trier of fact and is in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Carter*, 72 Ohio St.3d 545, 552, 1995-Ohio-104, 651 N.E.2d 965. When reviewing a trial court's decision on a motion to suppress, an appellate court must uphold the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Dunlap*, 73 Ohio St.3d 308, 314, 1995-Ohio-243, 652 N.E.2d 988. We must defer to "the trial court's findings of fact and rely on its ability to evaluate the credibility of the witnesses," and then independently review whether the trial court applied the correct legal standard. *State v. Anderson* (1995), 100 Ohio App.3d 688, 691, 654 N.E.2d 1034.

**{¶11}** The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee "[t]he right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures." Accordingly, the State is prohibited from making unreasonable intrusions into areas where people have legitimate expectations of privacy without a search warrant. *United States v. Chadwick* (1977), 433 U.S. 1, 7, overruled on other grounds in *California v. Acevedo* (1991), 500 U.S. 565. The touchstone of any Fourth Amendment analysis

> **"is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security,'"** *Mimms*, **434 U.S., at 108–109, 98 S.Ct. at 332 (quoting** *Terry v. Ohio*, **392 U.S. 1, 19, 88 S.Ct. 1868, 1878–1879, 20 L.Ed.2d 889 (1968)), and that reasonableness "depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers,'"** *Mimms*, **434 U.S. at 109, 98 S.Ct. at 332 (quoting** *United States v. Brignoni–Ponce*, **422 U.S. 873, 878, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975)).**

*Maryland v. Wilson* (1997), 519 U.S. 408, 411. When trying to prove an exception to the Fourth Amendment's warrant requirement exists, the State bears the burden of proof in order to survive a motion to suppress. *State v. Kessler* (1978), 53 Ohio St.2d 204, 207, 373 N.E.2d 1252.

**{¶12}** One such exception to the warrant requirement has been commonly referred to as a "*Terry* pat-down." In the landmark case of *Terry v. Ohio*, the

-7-

United States Supreme Court held that an investigatory stop and frisk may be conducted on a person without violating the Fourth Amendment if two conditions are met. *Terry v. Ohio* (1968), 392 U.S. 1. "First, the investigatory stop must be lawful[,]" and "[s]econd, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." *Arizona v. Johnson* (2009), 555 U.S. 323, citing *Terry*, supra.

{¶13} Recently, the United States Supreme Court addressed the authority of a police officer to "stop and frisk" a passenger in a motor vehicle temporarily seized upon police detection of a traffic infraction. See *Arizona v. Johnson* (2009), 555 U.S. 323. In addressing this issue, the Court relied upon a number of its earlier decisions. The Court first noted that "[f]or the duration of a traffic stop * * * a police officer effectively seizes 'everyone in the vehicle,' the driver and all passengers." *Id*., quoting *Brendlin v. California* (2007), 551 U.S. 249, 255. Furthermore, "traffic stops are 'especially fraught with danger to police officers' * * * [and] '[t]he risk of harm to both the police and the occupants [of a stopped vehicle] is minimized,' * * * 'if the officers routinely exercise unquestioned command of the situation.'" *Johnson*, supra (internal citations omitted). The Court also noted that

> **once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment * * ***

> **[because] [t]he government's "legitimate and weighty" interest in officer safety, the Court said, outweighs the "*de minimis*" additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle.**

*Johnson*, supra, citing *Pennsylvania v. Mimms* (1977), 434 U.S. 106, 110-111.

{¶14} Likewise, the Supreme Court has extended this rule to passengers in stopped motor vehicles because "the same weighty interest in officer safety, * * * is present regardless of whether the occupant of the stopped car is a driver or passenger." *Wilson*, 519 U.S. at 413-415. In *Wilson*, the Supreme Court recognized that "the risk of a violent encounter in a traffic-stop setting 'stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop.'" *Johnson*, supra, quoting *Wilson*, 519 U.S. at 414. Thus, "'the motivation of a passenger to employ violence to prevent apprehension of such a crime * * * is every bit as great as that of the driver.'" *Johnson*, supra, quoting *Wilson*, supra. In addition, the Court found that "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car." *Wilson*, 519 U.S. at 415. As such, the Court in *Wilson*, held that an officer may order the passengers of a legally stopped motor vehicle to exit the vehicle. *Id*.

{¶15} Based on this line of cases, the Court found in *Johnson*, that "in a traffic-stop setting, the first *Terry* condition – a lawful investigatory stop – is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Johnson*, supra. Additionally, the police may proceed to the next step of patting down the passenger for weapons, if they "harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Id*. The Court then concluded that given the facts in *Johnson*, the officer was permitted to have the passengers of a stopped motor vehicle exit the vehicle during the time the vehicle was lawfully detained and to conduct a pat-down search of Johnson, a backseat passenger, if the officer had a reasonable suspicion that he was armed and dangerous.[1] *Id*.

{¶16} Here, the only evidence before the trial court was Officer's Aller's testimony. This testimony established that the vehicle in which Covert was a passenger was stopped for driving at night without using the headlights. Once Officer Aller ran each of the five occupant's driver's licenses, he learned that the driver had a prior drug arrest and that the female passenger had an outstanding misdemeanor warrant for her arrest. This heightened Officer Aller's attention

---

[1] The Supreme Court noted that the issue of whether the officer had a reasonable suspicion that Johnson was armed and dangerous was not before it because the lower court had assumed arguendo that the officer had a reasonable suspicion that Johnson was armed and dangerous. Rather, the issue before the Supreme Court concerned whether Johnson was still lawfully detained at the time of the pat-down or whether his conversation with the officer on a matter unrelated to the initial traffic stop ceased any authority the officer had to conduct a pat-down of Johnson absent a reasonable suspicion that Johnson had engaged or was about to engage in criminal activity (the first requirement of *Terry*). *Johnson*, supra.

during the remainder of the stop and led to his questioning the driver about the prior arrest and whether there was anything illegal in his vehicle. The driver stated that he did not live that kind of life any longer, informed Officer Aller that he did not have anything illegal in his vehicle, and gave Officer Aller consent to search the vehicle upon Officer Aller's request. In order to conduct the search of the vehicle, Officer Aller had all the occupants exit the vehicle one at a time and patted each down for weapons. Officer Aller also testified that he patted down the occupants of the vehicle for officer safety because when he is searching a vehicle he wants to make sure that there is nothing that can harm him while he is searching.

{¶17} Although he did not have an individualized suspicion that Covert or any of the other backseat passengers were armed and dangerous, the situation, in and of itself, called for precaution. Unlike the facts at issue in the cases previously discussed herein, Officer Aller was preparing to search a motor vehicle occupied by a number of people with only one other officer for back-up. The facts known to Officer Aller at the time were that the driver had previously been involved with drugs, having albeit claimed that he no longer lived that kind of life, the female passenger had a misdemeanor warrant for her arrest on an unknown charge that Officer Aller was having the dispatcher verify, and the other three occupants of the vehicles were males who were each approximately 5' 8" tall and weighed between

160-180 pounds. As previously noted, when Officer Aller had everyone exit the vehicle and began to pat them down, he had only one other officer there with him and he was planning to conduct a search of the vehicle, which would mean that his attention was going to be focused on the vehicle and its contents rather than on the five individuals removed from the car, leaving only one other officer to watch five people.

{¶18} As stated in *Terry*, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27, citing *Beck v. State of Ohio* (1964), 379 U.S. 89, 91; *Brinegar v. United States* (1949), 338 U.S. 160, 174-176; *Stacey v. Emery* (1878), 97 U.S. 642, 645. We find that under these circumstances, a reasonably prudent officer, who is about to search a vehicle, leaving five people (two of whom had issues that would cause any officer concern) to be watched by only one officer, would be warranted in the belief that his safety or that of his fellow officer was in danger. To require an officer to conduct a search of a vehicle under these circumstances without first conducting a minimal pat-down search of the vehicle's occupants simply because the five occupants were cooperative and the area of the search was not classified as "high-crime," places the officer in a potentially deadly situation. Although the officer did not have to ask for consent to search the

vehicle, the law permits him to do so, and the driver's consent to such a search allowed him to then conduct the search. Once the officer knew he was about to search the vehicle, it would have been a very unwise decision not to first take steps to ensure his safety. Therefore, we find that the pat-down of Covert was not unreasonable.

{¶19} Our review does not end here as we must now address whether Officer Aller violated Covert's Fourth Amendment rights by placing his hand in Covert's pockets. The trial court found that Covert voluntarily consented to this action.[2]

{¶20} Both the United States Supreme Court and the Ohio Supreme Court have held that when "'the State attempts to justify a search on the basis of consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances[.]'" *State v. Robinette*, 80 Ohio St.3d 234, 242-243, 1997-Ohio-343, 685 N.E.2d 762, quoting *Schneckloth v. Bustamonte* (1973), 412 U.S. 218,

---

[2] The trial court also found that the initial pat-down of Covert revealed an object which he testified he could not identify and could be a weapon. Thus, Officer Aller was permitted to retrieve this item from Covert's pocket to see if it was a weapon. See *State v. Evans*, 67 Ohio St.3d 405, 415-416, 1993-Ohio-186, 618 N.E.2d 162. However, the only testimony elicited from Officer Aller regarding what this object felt like was that he felt "some object" in Covert's pocket. He never testified that he could not identify the object during the pat-down, that it could be a weapon, or that its identity as contraband was immediately apparent to him during the pat-down, see *Minnesota v. Dickerson* (1993), 508 U.S. 366, 375. Given this state of the evidence, we will not address the "plain feel" doctrine.

248-249. Further, "[v]oluntary consent, determined under the totality of the circumstances, may validate an otherwise illegal detention and search." *Robinette*, 80 Ohio St.3d at 241, citing *Davis v. United States* (1946), 328 U.S. 582, 593-594.

{¶21} In the case sub judice, Officer Aller obtained consent to search the vehicle from the driver. He patted down the driver, told him to stand by Officer Chandler, and then asked Covert, who was seated directly behind the driver's seat to step out of the vehicle. He next informed Covert that he was going to pat him down for weapons for officer safety. He had Covert place his hands on the hood of the car and slightly spread his feet apart. He then began the pat-down of Covert at Covert's shoulders and proceeded to work his way down Covert's body. When he got to Covert's pocket, he was able to feel an object inside the pocket. At this time, he asked Covert for permission to put his hand in the pocket. Covert gave him permission, and Officer Aller placed his hand in his pockets, discovering the pipes and marijuana. He placed these objects on the hood of the car and asked Covert about them.

{¶22} Officer Aller then continued patting Covert down for weapons. After discovering Covert had no weapons, the officer had Covert step over to where Officer Chandler and the driver were and continued to search the other occupants of the vehicle, none of whom had weapons or contraband, one by one. Officer

-14-

Aller searched the vehicle once he had checked each occupant for weapons. Upon finding no weapons or contraband in the vehicle and confirming that the warrant for the female passenger remained active, Officer Aller placed her in custody, gave the driver a warning for not using his headlights, and issued a citation and summons to Covert for the paraphernalia and marijuana. The driver, Covert, and the two other male passengers were then released from the scene. Covert thanked Officer Aller for giving him a citation in lieu of arrest and left with the others. Officer Aller testified that everyone involved in the stop was very cooperative throughout the stop.

{¶23} Given the totality of the circumstances, we do not find that Covert's consent was the result of duress or coercion, express or implied. There is no evidence that Covert felt compelled to submit to Officer Aller's request to place his hand in his pockets. In fact, although Officer Aller *told* Covert that he was going to pat him down for weapons for officer safety, he stopped this pat down and specifically *asked* Covert for permission to enter his pockets. At this point, Covert told Officer Allen that he could. Additionally, only the driver had been patted down for weapons when Covert was subjected to his pat-down and there was no evidence that Officer Aller placed his hand in any of the driver's pockets. Thus, it cannot be said that Covert witnessed the pat down of a number of his

companions, that each of the others also had their pockets searched, and that he was merely submitting to a claim of lawful authority as the others had done.

{¶24} In short, the evidence before the trial court did not indicate that any of the officer's actions were coercive nor did it indicate that Covert was subjected to deceptive practices by the officer to elicit his consent or that he felt duress during the encounter with Officer Aller. Rather, the evidence established that the driver, Covert, and the other passengers had been cooperative throughout the incident of their own accord. Therefore, we do not find that the trial court erred in finding that Covert voluntarily consented to a search of his pockets, and Covert's assignment of error is overruled.

{¶25} For all of these reasons, the judgments of the Tiffin Municipal Court are affirmed.

*Judgments Affirmed*

**WILLAMOWSKI, J., concurs.**

**ROGERS, P.J., Concurring Separately.**

{¶26} I concur in judgment only as to the opinion of the majority. Further, it is my opinion that this matter was improperly assigned two case numbers in the Tiffin Municipal Court. Multiple misdemeanor charges resulting from "the same act, transaction, or series of acts or transactions" should be assigned only one case

number.  See Sup. R. 43(B)(3) and the attendant commentary.  To assign separate case numbers and to report them separately artificially inflates the statistics reported by the court and judge pursuant to Sup. R. 37.