[Cite as *State v. Mitchell*, **2013-Ohio-3696.**]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|                         |   | JUDGES:                     |
|-------------------------|---|-----------------------------|
| STATE OF OHIO           | : | Hon. W. Scott Gwin, P.J.    |
|                         | : | Hon. John W. Wise, J.       |
| Plaintiff-Appellee      | : | Hon. Craig R. Baldwin, J.   |
|                         | : |                             |
| -vs-                    | : |                             |
|                         | : | Case No. 2013CA00030        |
| MARLON EUGENE MITCHELL  | : |                             |
|                         | : |                             |
| Defendant-Appellant     | : | O P I N I ON                |

CHARACTER OF PROCEEDING:    Criminal appeal from the Stark County
                            Court of Common Pleas, Case No. 2012-
                            CR-1277

JUDGMENT:                   Affirmed

DATE OF JUDGMENT ENTRY:     August 26, 2013

APPEARANCES:

For Plaintiff-Appellee                  For Defendant-Appellant

JOHN D. FERRERO                         JACOB WILL
Stark County Prosecutor                 116 Cleveland Avenue N.W., Ste. 808
BY: KATHLEEN O. TATARSKY                Canton, OH  44702
Assistant Prosecuting Attorney
110 Central Plaza South, Ste. 510
Canton, OH  44702

*Gwin, P.J.*

{¶1} Appellant Marlon Mitchell ["Mitchell"] appeals from the January 14, 2013 entry of the Stark County Court of Common Pleas convicting and sentencing him after a jury trial of one count of aggravated robbery, a felony of the first degree, and one count of aggravated burglary a felony of the first degree.

*Facts and Procedural History*

{¶2} The charges in the case at bar stem from a home invasion robbery and burglary by Mitchell and another unidentified person at the apartment of Dawn Turpin in the early morning hours of June 24, 2012.

{¶3} On June 24, 2012 about 1:00 a.m., Turpin was returning to her apartment from her daughter's house. Aware of the lateness of the hour, she looked around as she pulled into the driveway of the apartment building heading to the parking ramp. She saw two young men cross Market Avenue and head to the front stairs, which marked the apartment entryway. She parked her car without incident, placed the two baskets of newly washed clothes she had in a shopping cart, got on the elevator and pressed seven for her floor.

{¶4} The elevator stopped on the first floor and the two young men she had seen crossing the street got on. One stood beside her and the other one was closer to the elevator door. The taller one was darker skinned wearing a dark ball cap and dark clothes. The shorter one wore a white scarf around his neck and tan boots. Turpin tried to make some small talk, asking them how they were doing and what floor did they want. The one beside her pushed the button for floor five. They got off on five and when

Turpin told them to "take it easy," they nodded. In all, Turpin spent about three minutes with the two males on the elevator.

{¶5} Turpin continued her ride to floor seven, got off with her shopping cart filled with laundered clothes, unlocked her door and threw down her keys, purse and cell phone; she had to use the bathroom. While in the bathroom, she heard a loud noise; then she heard a second one. She opened the bathroom door and encountered the same two young men; one now wearing the white scarf around his face holding a gun with a silencer on it and the other one in her bedroom. She threw up her hands saying "oh no." The one holding the gun told her to get down. Turpin asked him, "[W]hat do you want? The young man said, "you're with the African kid...where are the Africans."

{¶6} At first, she did not know what they were talking about, but then it hit her - two Africans lived at the end of the hall, opposite side, in Apartment 704. Turpin told them, "there's some Africans down the hall." The man in the bedroom came out, telling his partner, "let her live" and they exited the apartment.

{¶7} Several items of jewelry and her cell phone having been stolen by the intruders, Turpin grabbed her purse and keys and ran down seven flights of stairs to her car. She went to her friend's house and called 9-1-1. Meanwhile, her neighbor, Rodney Bryant, heard the loud banging and Turpin screaming and called 9-1-1. About three days after the robbery and burglary, Bryant was talking with Tarvia Smith, aka "Chicago" who lived with the two African men who occupied Unit 704. She mentioned that she might know the name of one of the men involved in the crimes, Marlon Mitchell. She used Bryant's laptop computer and showed him a picture of Mitchell on his

Facebook page, Bryant showed the Facebook page with the picture of Mitchell to Turpin. Turpin looked at the Facebook photo for a few minutes and said she was 100 percent sure that Mitchell was one of the young men who broke into her apartment. Bryant told her his name - Marlon Mitchell.

{¶8} Turpin told Detective Pileggi of the Canton Police Department about the Facebook picture and that a possible suspect was Marlon Mitchell. Pileggi, however, never saw the Facebook picture. Pileggi put the name "Marlon Mitchell" into his computer system and verified that it was Mitchell. He then put together a photo line-up using a software system called OLEG [Ohio Law Enforcement Guide]. OLEG pulled up a picture of Mitchell's driver's license. From that, he was able to assemble five other photos that closely matched Mitchell in skin color, eye color, height, weight and other characteristics. He assembled six photos including Mitchell.

{¶9} On July 6, 2012, Turpin viewed the photo lineup of the six photos prepared by Pileggi. Pileggi followed the line up procedure mandated by R.C. 2933.83, including the use of ten shuffled, identical unmarked manila folders, four of which were blank. A "blind administrator," Detective Richard Harbarger, administered the lineup at her apartment. Harbarger did not know who the suspect was and told Turpin the suspect may or may not be in the photos. Turpin looked at the photos two times and assigned Mitchell, whose photo was in folder 3, a rating of 5 both times. On a scale of 1 to 5, one being certain it is not the perpetrator and five being that it is the perpetrator, Turpin rated Mitchell a five. Harbarger reported the findings to Detective Pileggi and also reported that there was some confusion as Turpin thought both suspects were in the lineup and assigned a number 3 to another photo for the suspect with the gun. On

cross-examination, Pileggi agreed that the other five individuals in the photo lineup were not involved in the incident at Turpin's residence.

{¶10} Mitchell was arrested and interviewed by Pileggi. Mitchell denied any involvement in the crime. Pileggi, however, found it strange that when he asked Mitchell why the victim would identify him, Mitchell replied by saying, "she has the wrong person." When asked how he knew the victim was a woman, Mitchell responded that she contacted him on his Facebook page asking him why he did that to her. Turpin denied ever using Facebook or even owning a computer.

{¶11} While in the Stark County Jail awaiting trial, Mitchell made a telephone call to seventeen-year-old Brittany Ann Slovick. Slovick had been a friend of Mitchell's for about a year and a half and had a romantic relationship with him. She knew him by the monikers "King" or "Peter Pan." On August 14, 2012, Mitchell called Slovick on her mother's cell phone and thirty seconds of the call was played for the jury. During the conversation, Slovick asked Mitchell why he was in jail. Mitchell responded saying "DJ and I...DJ and somebody kicked in some doors." On cross-examination, Slovick testified that in all of the conversations she had with Mitchell, he denied being involved in the incident at Turpin's apartment.

{¶12} Mitchell called Hattie Howard to the stand. Howard, Mitchell's girlfriend testified that Mitchell was living with her in Cuyahoga Falls in the summer of 2012. Howard testified that on the night of June 24, 2012, Mitchell was with her in Cuyahoga Falls. Howard stated that she made breakfast on June 24, 2012, then went to the park, ate dinner, watched movies, and then fell asleep with Mitchell.

{¶13} Mitchell challenged his identification during a photo lineup by filing a motion to suppress on November 2, 2012. The matter came on for evidentiary hearings on November 14 and November 20, 2012. The state presented the testimony of the two police officers involved in the photo lineup and Mitchell presented the testimony of Rodney Bryant. At the conclusion of the hearing, the trial court overruled the motion finding that the photo lineup was not tainted.

{¶14} Mitchell's jury trial began on January 8, 2013 and lasted two days. At the trial's conclusion, the jury found Mitchell guilty of the charges in the indictment.

{¶15} The trial court found that the crimes of aggravated burglary and aggravated robbery were separate crimes and sentenced Mitchell to ten years on the aggravated robbery and ten years on the aggravated burglary to be served concurrently for a total prison term of ten years.

*Assignments of Error*

{¶16} Mitchell raises two assignments of error:

{¶17} "I. THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS THE OUT-OF-COURT IDENTIFICATION OF APPELLANT.

{¶18} "II. THE DEFENDANT'S CONVICTIONS FOR ONE COUNT OF AGGRAVATED ROBBERY IN VIOLATION OF R.C. 2911.01 AND ONE COUNT OF AGGRAVATED BURGLARY IN VIOLATION OF R.C. 2911.11 WERE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

I.

{¶19} In his first assignment of error, Mitchell argues that the trial court erred by not suppressing the photo lineup identification of him by Turpin. Mitchell claims that the

procedure was tainted because Turpin had previously viewed Mitchell's Facebook photograph.

{¶20}  Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 154-155, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When ruling on a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and to evaluate witness credibility. See *State v. Dunlap*, 73 Ohio St.3d 308,314, 1995-Ohio-243, 652 N.E.2d 988; *State v. Fanning*, 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982). Accordingly, a reviewing court must defer to the trial court's factual findings if competent, credible evidence exists to support those findings. See *Burnside,* supra; *Dunlap,* supra; *State v. Long*, 127 Ohio App.3d 328, 332, 713 N.E.2d 1(4th Dist. 1998); *State v. Medcalf*, 111 Ohio App.3d 142, 675 N.E.2d 1268 (4th Dist.1996). However, once this Court has accepted those facts as true, it must independently determine as a matter of law whether the trial court met the applicable legal standard. See *Burnside,* supra, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539(4th Dist 1997); See, generally, *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740(2002); *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911(1996). That is, the application of the law to the trial court's findings of fact is subject to a *de novo* standard of review *Ornelas*, supra. Moreover, due weight should be given "to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas*, supra at 698, 116 S.Ct. at 1663.

{¶21} Introducing as evidence the results of an unduly suggestive police identification procedure may violate a defendant's right to due process and require a

trial court to suppress that evidence. *See Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969) (finding that due process required the exclusion of an eyewitness identification obtained through a procedure making identification of the defendant inevitable). Due process concerns arise, however, only when (1) the identification procedure is arranged by law enforcement officials, (2) the procedure is unnecessarily suggestive, and (3) the procedure creates a substantial likelihood of misidentification. *See Perry v. New Hampshire,* __U.S.__, 132 S.Ct. 716, 724, 181 L.Ed. 2d 694 (2012). Moreover, even when police use an unduly suggestive procedure, due process does not necessarily require the suppression of the resulting identification. *Manson v. Brathwaite,* 432 U.S. 98, 112–13, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). "Where the 'indicators of [a witness'] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed. Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury." *Id.* (citations omitted).

{¶22} *Perry* clarified that the due process concerns on which the undue-suggestiveness framework is based arise only when identification is "infected by improper *police* influence." 132 S.Ct. at 720 (emphasis added). By contrast, the Supreme Court stated that it would "not [extend] pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers." *Id.* at 720– 21. It reached this outcome by noting that the undue-suggestiveness framework is not premised on unreliability of evidence alone, but "turn[s] on the presence of state action and aim[s] to deter police from rigging identification procedures." *Id.* at 721.

{¶23} In *Perry*, police responded to a call reporting that an African–American male was trying to break into cars parked in the lot of the caller's apartment building. Officer Clay responded to the call. Upon arriving at the parking lot, Clay heard what "sounded like a metal bat hitting the ground." She then saw Perry standing between two cars. Perry walked toward Clay, holding two car-stereo amplifiers in his hands. A metal bat lay on the ground behind him. Clay asked Perry where the amplifiers came from. "[I] found them on the ground," Perry responded.

{¶24} By this time, another officer had arrived at the scene. Clay asked Perry to stay in the parking lot with that officer, while she and another tenant went to talk another eyewitness inside the apartment building. When the officer asked the eyewitness to describe the man, the witness pointed to her kitchen window and said the man she saw breaking into the car was standing in the parking lot, next to a police officer. Perry's arrest followed this identification.

{¶25} On appeal, Perry argued that the trial court erred in requiring an initial showing that police arranged a suggestive identification procedure. Suggestive circumstances alone, Perry contended, suffice to require court evaluation of the reliability of an eyewitness identification before allowing it to be presented to the jury.

{¶26} The Supreme Court in *Perry* held the Due Process Clause does not require a preliminary judicial inquiry into the reliability of eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement. In other words, if there is no showing that police employed an unduly suggestive procedure to obtain an identification, the unreliability of the identification alone will not preclude its use as evidence at trial. Instead, such

unreliability should be exposed through the rigors of cross-examination. *Perry* at 132 S.Ct. at 728-730.

{¶27} In the case at bar, the police did not obtain, view or ask Turpin to view the Facebook photograph of Mitchell. Thus, in the case at bar there was no improper police influence in the identification procedure. Therefore, the trial court correctly overruled Mitchell's motion to suppress.

{¶28} Mitchell's first assignment of error is overruled.

II.

{¶29} Mitchell's second assignment of error raises a joint manifest-weight and sufficiency of the evidence claim. Mitchell does not contest that the robbery and burglary of Turpin occurred, but instead challenges the evidence that identified him as the robber in this case.

{¶30} Our review of the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which requires a court of appeals to determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id.; see also *McDaniel v. Brown*, 558 U.S. 120, 130 S.Ct. 665, 673, 175 L.Ed.2d 582(2010) (reaffirming this standard); *State v. Fry*, 125 Ohio St.3d 163, 926 N.E.2d 1239, 2010–Ohio–1017, ¶ 146; *State v. Clay*, 187 Ohio App.3d 633, 933 N.E.2d 296, 2010–Ohio–2720, ¶ 68.

{¶31} Weight of the evidence addresses the evidence's effect of inducing belief. *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997), *superseded*

*by constitutional amendment on other grounds as stated by State v. Smith,* 80 Ohio

St.3d 89, 684 N.E.2d 668, 1997-Ohio–355. Weight of the evidence concerns "the

inclination of the greater amount of credible evidence, offered in a trial, to support one

side of the issue rather than the other. It indicates clearly to the jury that the party

having the burden of proof will be entitled to their verdict, if, on weighing the evidence in

their minds, they shall find the greater amount of credible evidence sustains the issue

which is to be established before them. Weight is not a question of mathematics, but

depends on its effect in inducing belief." (Emphasis sic.) Id. at 387, 678 N.E.2d 541,

quoting Black's Law Dictionary (6th Ed. 1990) at 1594.g2

{¶32} When a court of appeals reverses a judgment of a trial court on the basis

that the verdict is against the weight of the evidence, the appellate court sits as a

"'thirteenth juror'" and disagrees with the fact finder's resolution of the conflicting

testimony. Id. at 387, 678 N.E.2d 541, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102

S.Ct. 2211, 72 L.Ed.2d 652 (1982). However, an appellate court may not merely

substitute its view for that of the jury, but must find that "'the jury clearly lost its way and

created such a manifest miscarriage of justice that the conviction must be reversed and

a new trial ordered.'" *State v. Thompkins*, supra, 78 Ohio St.3d at 387, quoting *State v.*

*Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist. 1983).

Accordingly, reversal on manifest weight grounds is reserved for "'the exceptional case

in which the evidence weighs heavily against the conviction.'" Id.

"[I]n determining whether the judgment below is manifestly against

the weight of the evidence, every reasonable intendment and every

reasonable presumption must be made in favor of the judgment and the finding of facts.

* * *

"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

**{¶33}** Mitchell argues that there is no physical evidence collected from Turpin's apartment linking him to the commission of any crime. He claims that only the only evidence of his involvement is the testimony of Turpin. He claims that her testimony is unreliable because she selected photographs of both of the suspects that had entered her apartment from the photo array presented to her by the police. However, the evidence at trial revealed that the second suspect was not pictured in the array.

**{¶34}** The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger,* 77 Ohio St.3d 415, 1997-Ohio-260, 674 N.E.2d 1159. Ultimately, "the reviewing court must determine whether the appellant or the appellee provided the more believable evidence, but must not completely substitute its judgment for that of the original trier of fact 'unless it is patently apparent that the fact finder lost its way.'" *State v. Pallai,* 7th Dist. No. 07 MA 198, 2008-Ohio-6635, ¶31, quoting *State v. Woullard,* 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964, ¶ 81. In other words,

"[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke,* 7th Dist. No. 99 CA 149, 2002-Ohio-1152, at ¶ 13, citing *State v. Gore* (1999), 131 Ohio App.3d 197, 201, 722 N.E.2d 125.

**{¶35}** The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212(1967), paragraph one of the syllabus; *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶118. *Accord, Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983). The jury was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence". *State v. Craig*, 10th Dist. No. 99AP-739, 2000 WL 297252 (Mar 23, 2000) citing *State v. Nivens*, 10th Dist. No. 95APA09-1236, 1996 WL 284714 (May 28, 1996). Indeed, the [judge] need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver,* Franklin App. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke,* 10th Dist. No. 02AP-1238, 2003-Ohio-2889, citing *State v. Caldwell* (1992), 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992). Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, supra.

"[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.

* * *

"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

**{¶36}** In *Cross v. Ledford,* 161 Ohio St. 469, 477, 120 N.E. 2d 118 (1954), the Supreme Court further cautioned,

The mere number of witnesses, who may support a claim of one or the other of the parties to an action, is not to be taken as a basis for resolving disputed facts. The degree of proof required is determined by the impression which the testimony of the witnesses makes upon the trier of facts, and the character of the testimony itself. Credibility, intelligence, freedom from bias or prejudice, opportunity to be informed, the disposition to tell the truth or otherwise, and the probability or improbability of the statements made, are all tests of testimonial value. *Where the evidence is in conflict, the trier of facts may determine what should be accepted as the*

*truth and what should be rejected as false*. See *Rice v. City of Cleveland*,

114 Ohio St. 299, 58 N.E.2d 768.

161 Ohio St. at 477-478. (Emphasis added).

**{¶37}** The alleged inconsistencies in the evidence fall short of supporting Mitchell's claims that the manifest weight of the evidence does not support his conviction.

**{¶38}** Turpin testified that she viewed the perpetuators as they crossed the street, while they rode the elevator with her and while holding her at gunpoint inside her apartment. Turpin gave Mitchell's picture a rating of five on the two occasions that she viewed it. Five is the highest degree of confidence in the identification. Testimony that Mitchell called a friend from jail and made statements concerning kicking doors in was also presented to the jury. Turpin was cross-examined vigorously and Mitchell argued to the jury that Turpin had to be wrong because she identified a second suspect in the photo array in spite of the fact that the second suspect's picture was not included in the array. Nevertheless, the jury heard the witnesses, evaluated the evidence, and was convinced of Mitchell's guilt.

**{¶39}** We find that this is not an "'*exceptional* case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541 *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. The jury was in the best position to evaluate this competent, credible evidence, and we will not substitute our judgment for that of the trier of fact. The jury neither lost their way nor created a miscarriage of justice in convicting Mitchell of the charges.

**{¶40}** Mitchell's second assignment of error is overruled.

{¶41} For the reasons stated in the foregoing opinion, the decision of the Court of Common Pleas, Stark County, Ohio, is hereby affirmed.

By Gwin, P.J.,

Wise, J., and

Baldwin, J., concur

_____

HON. W. SCOTT GWIN

_____

HON. JOHN W. WISE

_____

HON. CRAIG R. BALDWIN

WSG:clw 0814

IN THE COURT OF APPEALS FOR STARK COUNTY, OHIO

FIFTH APPELLATE DISTRICT

STATE OF OHIO                          :
                                       :
            Plaintiff-Appellee         :
                                       :
                                       :
-vs-                                   :          JUDGMENT ENTRY
                                       :
MARLON EUGENE MITCHELL                 :
                                       :
                                       :
            Defendant-Appellant        :          CASE NO. 2013CA00030


     For the reasons stated in our accompanying Memorandum-Opinion, the decision of the Court of Common Pleas, Stark County, Ohio, is hereby affirmed. Costs to appellant.


_____
HON. W. SCOTT GWIN


_____
HON. JOHN W. WISE


_____
HON. CRAIG R. BALDWIN