[Cite as *State v. Taylor*, 2017-Ohio-4059.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. Craig R. Baldwin, J. |
| Plaintiff-Appellee | : | Hon. Earle E. Wise, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 16CA66 |
| DARRYL J. TAYLOR | : |  |
|  | : |  |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:     Criminal appeal from the Richland County Court of Common Pleas, Case No. 2014CR0468R

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     May 30, 2017

APPEARANCES:

For Plaintiff-Appellee

DANIEL ROGERS
Assistant Prosecuting Attorney
Richland County Prosecutor's Office
38 S. Park Street
Mansfield, OH 44902

For Defendant-Appellant

R. JOSHUA BROWN
32 Lutz Avenue
Lexington, OH 44904

*Gwin, P.J.*

{¶1} Appellant, Darryl J. Taylor ["Taylor"] appeals the November 19, 2014 Judgment Entry of the Richland County Court of Common Pleas that overruled his motion to suppress all statements made from his interrogation on July 7, 2014.

*Facts and Procedural History*

{¶2} On August 12, 2014, an indictment was filed in the Common Pleas Court of Richland County, Ohio. Count One of the Indictment charged Taylor (aka) "Wheezy" with one count of Having Weapons While Under Disability in violation of R.C. 2923.13(A)(2), a felony of the third degree. Count Two of the Indictment charged Taylor with Receiving Stolen Property in violation of R.C. 2913.51(A), a felony of the fourth degree; the property involved being a firearm as defined in R.C. 2923.11. These crimes were alleged to have occurred between or on about May 9, 2014 and on or about July 7, 2014. The indictment was assigned Case Number 2014-CR-468.

{¶3} On October 23, 2014, a Motion to Suppress and/or Limine to Bar the Introduction of Evidence was filed on behalf of Taylor. This motion asked for an order excluding and/or suppressing all statements gained from the custodial interrogation of appellant "on or about July 9, 2014." (Sic) The interview actually occurred on July 7, 2014. The essence of the motion was that Taylor was not given *Miranda* warnings prior to his custodial interrogation in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution and Section 10, Article 1 of the Ohio Constitution. A hearing was held November 12, 2014. A Judgment Entry overruling Taylor's Motion to Suppress was filed November 19, 2014. On December 5, 2014, Taylor entered a no contest plea to both counts in Case Number 2014-CR-468.

**{¶4}** On December 8, 2014, an indictment was filed in Case No. 2014-CR-788, charging Taylor with murder. The murder was alleged to have occurred on or about July 7, 2014.

**{¶5}** Taylor filed a motion to withdraw his no contest plea in Case No. 2014-CR-468 on January 2, 2015. The trial court granted Taylor's request by Judgment Entry filed January 22, 2015. The state filed a motion for joinder requesting Case Numbers 2014-CR-468 and 2014-CR-788 (Murder indictment) be tried together. The trial court granted the motion to join the two cases.

**{¶6}** Case numbers 2014-CR-468 and 2014-CR-788 were eventually scheduled for trial on September 8, 2016. On August 29, 2016, Taylor again entered a no contest plea to both counts in Case No. 2014-CR-468, Having Weapons While Under Disability and Receiving Stolen Property. The Court held sentencing in abeyance and Taylor proceeded to trial in Case No. 2014-CR-788 for the Murder charge.

**{¶7}** On July 15, 2016, Taylor was indicted for Tampering with Evidence. The indictment was assigned Case Number 2016-CR-478. The date alleged was July 7, 2014.

**{¶8}** The Tampering with Evidence case and Murder case were joined. Taylor was found guilty by a jury of both counts.

**{¶9}** In Case Number 2014-CR-468 the court imposed a 24 month prison sentence on Count I for Having a Weapon While Under Disability and merged Count II with Count I. The 24 months imposed in 2014-CR-468 was to run consecutive to the sentence imposed in 2014-CR-788 [Murder] and 2016-CR-478 [Tampering with Evidence].

*Motion to Suppress.*

{¶10} The following evidence was adduced during the November 12, 2014 hearing on Taylor's motion to suppress.

{¶11} During the Suppression Hearing on November 12, 2014, the state presented testimony from Sergeant Will Gordon and introduced a video recording of Taylor's interview with Sergeant Gordon and Detective Pat Smith from July 7, 2014. (State's Exhibit 1). Taylor introduced a transcript of his interview from July 7, 2014. (Defendant's Exhibit A).

{¶12} On July 7, 2014, Sergeant Gordon of the Richland County Sheriff's Office ["RCSO"] was dispatched to 1273 Kings Corners East Road in Richland County, Ohio in response to a report that there was a deceased person at that location. Upon Sergeant Gordon's arrival, he noticed several people in the area that were distraught/upset. Sergeant Gordon discovered a deceased D. H. lying on a bed covered by a sheet, with a gunshot wound in her chin, and a .44 Magnum Red Hawk handgun in her right hand.

{¶13} After discovering the body, Deputies made contact with three individuals who were inside 1273 Kings Corner East Road at the time of the shooting: Shane Lambert, Bonnie Tittle, and Taylor.

{¶14} Mr. Lambert, Ms. Tittle, and Taylor, were not handcuffed, arrested, or considered suspects at that point. Each agreed to provide the police statements regarding what happened to D.H. Mr. Lambert, Ms. Tittle, and Taylor were each transported to RCSO in RCSO vehicles, as the interviews could not be conducted at 1273 Kings Corner East Road due to the coroner's investigation of the scene.

**{¶15}** Deputy Kiener brought Taylor to the detective bureau in a Sheriff's cruiser. Taylor was placed in the back seat of the cruiser. Sergeant Gordon testified there is no way for a person to get out of the back seat if the doors are locked, as they should be. Taylor was not afforded the opportunity to obtain a shirt before being transported. Taylor appears shirtless throughout the interview. Taylor was not permitted to enter the residence to retrieve a shirt due to the ongoing onsite investigation.

**{¶16}** Upon arriving at RCSO, Deputies took Taylor to an unlocked interview room. The interview room resembled the living room of a home, with two leather sofas and a coffee table. Sergeant Gordon and Detective Pat Smith were dressed in plain clothes during the interview with Taylor. When Taylor first enters the interview room the date and time reflected on the video is July 7, 2014 Monday 11:45. Sergeant Gordon's first contact with Taylor is at 12:25.

**{¶17}** During his interview with Sergeant Gordon and Detective Smith, Taylor was neither handcuffed nor restrained in any way. Taylor, who had multiple prior felony convictions, admitted that he and D.H. had purchased the .44 Magnum Red Hawk "off the street." Taylor advised the officers that he would cooperate with the investigation and provide a DNA swab, but did not want to sign anything. The officers did not require Taylor to sign anything during or after the interview.

**{¶18}** Taylor was permitted to use the restroom. Taylor's hands were "bagged" and he was advised not to wipe or wash anything. An officer accompanied Taylor and observed Taylor while Taylor was in the restroom.

**{¶19}** At the conclusion of the interview, Sergeant Gordon asked Taylor if he had voluntarily spoken with him and Detective Smith, to which Taylor responded "yes."

Sergeant Gordon also asked if Taylor had been threatened in any way or by anyone regarding his statement to which Taylor responded "no." Detective Smith then asked Taylor if his statement was made of his own free will, to which Taylor responded "yes." Detective Smith asked if anyone had forced Taylor to provide a statement, to which Taylor responded "no." Detective Smith lastly advised Taylor that he was not under arrest and that his statement was made as a witness. Taylor advised Detective Smith that he knew he was not under arrest at the time of his statement.

{¶20} Following the interviews at RCSO, Taylor was arrested for having a weapon while under disability. *See, Investigative Narrative, Sgt. Michael T. Vicars* at 1 [Docket Entry #2]*; Investigative Follow-up, Det. Stacey Dittrich,* at 2 [Docket Entry #2].

*Assignment of Error*

{¶21} "I. THE TRIAL COURT COMMITTED ERROR BY FAILING TO SUPPRESS APPELLANT'S STATEMENT GIVEN TO SGT. WILL GORDON AND DETECTIVE PAT SMITH ON JULY 7, 2014. THE STATEMENT WAS TAKEN IN VIOLATION OF *MIRANDA V. ARIZONA* (1966) 384 U.S. 436, VIOLATING APPELLANT'S RIGHTS AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION."

*Law and Analysis*

{¶22} In his sole Assignment of Error, Taylor argues that Sergeant Gordon and Detective Smith subjected him to improper custodial interrogation without advising him of his *Miranda* rights.

### *Standard of Review.*

{¶23} Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 154-155, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When ruling on a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and to evaluate witness credibility. See *State v. Dunlap*, 73 Ohio St.3d 308,314, 1995-Ohio-243, 652 N.E.2d 988; *State v. Fanning*, 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982). Accordingly, a reviewing court must defer to the trial court's factual findings if competent, credible evidence exists to support those findings. See *Burnside,* supra; *Dunlap,* supra; *State v. Long*, 127 Ohio App.3d 328, 332, 713 N.E.2d 1(4th Dist. 1998); *State v. Medcalf*, 111 Ohio App.3d 142, 675 N.E.2d 1268 (4th Dist. 1996). However, once this Court has accepted those facts as true, it must independently determine as a matter of law whether the trial court met the applicable legal standard. See *Burnside,* supra, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539(4th Dist. 1997); See, generally, *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740(2002); *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911(1996). That is, the application of the law to the trial court's findings of fact is subject to a *de novo* standard of review *Ornelas*, supra. Moreover, due weight should be given "to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas*, supra at 698, 116 S.Ct. at 1663.

### *Miranda v. Arizona.*

{¶24} The Fifth Amendment to the United States Constitution guarantees that "'[n]o person * * * shall be compelled in any criminal case to be a witness against himself,' and that 'the accused shall * * * have the Assistance of Counsel.'" (*Ellipses sic.*) *Miranda*

*v. Arizona,* 384 U.S. 436, 442, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Accord, State v. Barker,* ___ Ohio St.3d ___, 2016-Ohio-2708, ___N.E.2d ___ (Apr. 28, 2016), ¶21. The inherently coercive nature of custodial interrogation heightens the risk that a suspect will be denied the Fifth Amendment privilege not to be compelled to incriminate himself because custodial interrogation can " 'undermine the individual's will to resist and * * * compel him to speak where he would not otherwise do so freely.'" (*Ellipsis sic.*) *J.D.B. v. North Carolina*, 564 U.S. 261, 131 S.Ct. 2394, 2401, 180 L.Ed.2d 310 (2011), *quoting Miranda* at 467, 86 S.Ct. 1602; *Dickerson v. United States*, 530 U.S. 428, 435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

**{¶25}** In light of the inherent coercion involved in custodial interrogation, *Miranda* established "a set of prophylactic measures" to safeguard the constitutional privilege against self-incrimination. *Id.* In broad terms, *Miranda* held that the state may not use a defendant's statements from custodial interrogation "unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda* at 444, 86 S.Ct. 1602. Prior to questioning, the police must warn the suspect "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* The Supreme Court recognized the importance of a suspect's "real understanding" of his rights and his intelligent decision whether to exercise them. Id. at 469, 86 S.Ct. 1602; *State v. Barker,* ___ Ohio St.3d ___, 2016-Ohio-2708, ___N.E.2d ___, ¶22.

**{¶26}** *Miranda* conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver

of rights before custodial questioning generally requires exclusion of any statements obtained. *Missouri v. Seibert*, 542 U.S. 600, 608, 124 S.Ct. 2601, 159 L.Ed.2d 643(2004).

### *Interrogation requiring Miranda Warnings.*

{¶27} In *Rhode Island v. Innis*, the United States Supreme Court defined "interrogation,"

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

446 U.S. 291, 300-302, 100 S.Ct. 1682, 64 L.Ed.2d 297(1980 (footnotes omitted).  The Court further noted, "[a]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect."  446 U.S. 302, 100 S.Ct. 1682, 64 L.Ed.2d 297, n.8.

### Custody under Miranda.

{¶28}  The United States Supreme Court has explained,

As used in our *Miranda* case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion.  In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of "the objective circumstances of the interrogation," *Stansbury v. California*, 511 U.S. 318, 322–323, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam), a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave."  *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).  And in order to determine how a suspect would have "gauge[d]" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation." *Stansbury, supra*, at 322, 325, 114 S.Ct. 1526 (internal quotation marks omitted).  Relevant factors include the location of the questioning, see *Shatzer*, supra, at —— – ——, 130 S.Ct., at 1223–1226, its duration, see *Berkemer v. McCarty*, 468 U.S. 420, 437–438, 104 S.Ct. 3138, 82 L.Ed.2d

317 G2 (1984), statements made during the interview, *see Mathiason, supra*, at 495, 97 S.Ct. 711; *Yarborough v. Alvarado*, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); *Stansbury, supra*, at 325, 114 S.Ct. 1526, the presence or absence of physical restraints during the questioning, *see New York v. Quarles,* 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), and the release of the interviewee at the end of the questioning, see *California v. Beheler*, 463 U.S. 1121, 1122–1123, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam).

Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda.* We have "decline[d] to accord talismanic power" to the freedom-of-movement inquiry, *Berkemer, supra*, at 437, 104 S.Ct. 3138, and have instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda.* "Our cases make clear ... that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Shatzer*, 559 U.S., at ——, 130 S.Ct. at 1224.

*Howes v. Fiel*ds, 565 U.S. 499, 508–09, 132 S.Ct. 1181, 1189, 182 L.Ed.2d 17 (2012). However, the test involves no consideration of the particular suspect's "actual mindset." *Yarborough v. California,* 541 U.S. 652, 667, 124 S.Ct. 2140, 158 L.Ed.2d 938(1994).

*Accord, State v. Mason*, 82 Ohio St.3d 144, 153, 1998-Ohio-370, 694 N.E.2d 932(1998);

*State v. Gumm* , 73 Ohio St.3d 413, 429, 1995 Ohio 24, 653 N.E.2d 253 (1995).

**{¶29}**  In determining that the prisoner in *Howes* was not in custody for purposes

of *Miranda*, the United States Supreme Court examined the totality of the circumstances

surrounding his interrogation:

> The record in this case reveals that respondent was not taken into
> custody for purposes of *Miranda*.  To be sure, respondent did not invite the
> interview or consent to it in advance, and he was not advised that he was
> free to decline to speak with the deputies.  The following facts also lend
> some support to respondent's argument that Miranda's custody requirement
> was met: The interview lasted for between five and seven hours in the
> evening and continued well past the hour when respondent generally went
> to bed; the deputies who questioned respondent were armed; and one of
> the deputies, according to respondent, "[u]sed a very sharp tone," App. to
> Pet. for Cert. 76a, and, on one occasion, profanity, see id., at 77a.
>
> These circumstances, however, were offset by others.   Most
> important, respondent was told at the outset of the interrogation, and was
> reminded again thereafter, that he could leave and go back to his cell
> whenever he wanted.  See id., at 89a–90a ("I was told I could get up and
> leave whenever I wanted"); id., at 70a–71a.  Moreover, respondent was not
> physically restrained or threatened and was interviewed in a well-lit,
> average-sized conference room, where he was "not uncomfortable."  Id., at
> 90a; see id., at 71a, 88a–89a.  He was offered food and water, and the door

to the conference room was sometimes left open. See id., at 70a, 74a. "All of these objective facts are consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave." *Yarborough, supra*, at 664–665, 124 S.Ct. 2140.

565 U.S. at 514–515, 132 S.Ct. 1181, 182 L.Ed.2d 17.

### Taylor was not "in custody" for purposes of Miranda.

**{¶30}** In the case at bar, Taylor was taken from the scene to the sheriff's office in a sheriff's vehicle. In *State v. Durham*, the Court observed,

It is well-established that "[c]onfining an individual to the police cruiser is not a custodial placement if it is part of the investigation, even if the suspect in the police cruiser is not free to leave." *State v. Popp*, 12th Dist. Butler No. CA2010–05–128, 2011-Ohio-791, 2011 WL 646662, ¶ 20, quoting In re M.D., 12th Dist. Madison No. CA2003–12–038, 2004-Ohio-5904, 2004 WL 2505161, ¶ 18. Moreover, "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process ordinarily does not fall within the ambit of custodial interrogation." *State v. Rivera–Carrillo*, 12th Dist. Butler No. CA2001–03–054, 2002 WL 371950, *3 (Mar. 11, 2002).

12th Dist. Warren No. 2013-03-023, 2013-Ohio-4764, ¶23.

**{¶31}** At the time of the questioning, the police were investigating a possible suicide. Everyone who was known to be present at the home at the time of the incident was brought to the station for questioning and testing. Taylor was left alone inside the room for a significant period before the officers came to speak with him.

{¶32} The interview room's two doors were closed. However, the two officers were in plain clothes and spoke in a calm, non–threatening manner. Taylor was not restrained in any manner.

{¶33} Taylor was clearly informed at the beginning of the interview that he had a right to refuse the request for a DNA sample and a gunshot residue test. When asked if he was okay with submitting to the tests, Taylor responded, "Yes, sir." Taylor clearly informed the officers of his desire to voluntarily assist in their investigation. Taylor further stated,

> Y'all Y'all gotts do y'all can test all my DNA all that I just don't wanna sign nothin' including you know (inaudible). I don't wanna sign this paper.

> \* \* \*

> Man y' all can take whatever y'all wanna take from me man but I don't wanna sign this paper man I don't wanna sign anything.

> \* \* \*

> Q. And you can understand that it would be normal course for us to interview everybody that was there right? Yes. And you also can understand that it would be normal for us to check the clothing of that [sic.] everybody that was there right? And you shook your head at both times. You also understand while I then [sic.] we would need to check the buccal swabs and take DNA from everybody.

> A. Yeah I don't have I don't have no problem with any of those things. I just don't you know what I'm saying don't want to get caught up in no

nonsense you know what I'm talking about I'm going through enough right now.  (Inaudible)  I'm gonna [sic.] through enough man and it's too much.

*** 

Well you most definitely do my residue on my hands I don't have no problem with it.

Q. Okay.  And so you agree to let us do the residue on your hands and do the buccal swabs and everything?

A. Yes, sir.

**{¶34}**  In the case at bar, the interview video demonstrates that Taylor, although distraught was, for the most part, calm and responsive to questions; the law enforcement officers were not coercive, threatening, or dominating; and the law enforcement officers did not trick or overpower Taylor into making involuntary statements.  Taylor was provided water by the officers when requested and he was free to move about unhindered.

**{¶35}**  Based upon a review of the complete record, we find that the objective facts are consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave.

### *Taylor volunteered incriminating statements concerning the gun.*

**{¶36}**  The officers asked Taylor, "Darryl where did the gun come from?"  We find the officers' questioning was merely a part of the investigation into the allegations that D.H. had committed suicide.  The answer to the question could have been either innocuous or incriminating.  *Miranda* does not affect the admissibility of "[v]olunteered statements of any kind."  384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.  In *Tolliver v. Sheets,* the Court provided the following guidelines,

The line between impermissible interrogation and permissible follow-up questions to volunteered statements is a fine one.  Police may listen to volunteered statements, and need not interrupt a suspect who is volunteering information in order to deliver a *Miranda* warning.  *See Miranda,* 384 U.S. at 478, 86 S.Ct. 1602.  Police may even interrupt a volunteered statement to ask clarifying or follow-up questions.  *See, e.g., U.S. v. Rommy,* 506 F.3d 108, 132–33 (2d Cir. 2007) (collecting cases); *Andersen v. Thieret,* 903 F.2d 526, 532 (7th Cir. 1990) (rejecting custodial interrogation challenge when, in response to suspect's volunteered statement, "I stabbed her," police asked, "Who?").  That said, when asking a suspect about volunteered information, police may at times cross the line from asking clarifying or follow-up questions into the "express questioning or its functional equivalent," *Innis*, 446 U.S. at 300–01, 100 S.Ct. 1682, barred by *Miranda.  See, e.g., United States v. Crowder,* 62 F.3d 782, 785–86 (6th Cir. 1995) (holding that police officer interrogated suspect when, after suspect stated that shotgun was "in the wood," officer asked clarifying question about location).  The Supreme Court, while not explicitly clarifying the distinction between permissible follow-up questions and impermissible interrogation, has stated in a different context that, even at meetings with the police initiated by a suspect, "[i]f, as frequently would occur ... the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be 'interrogation.' " *Edwards v. Arizona*, 451 U.S. 477, 486, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (addressing

whether police questioning of a suspect constitutes interrogation where the suspect first invoked his Fifth Amendment right to counsel but then arranged a meeting with investigators and volunteered information). Again, as the Supreme Court has made clear repeatedly, "[w]ithout obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions ... that are designed to elicit incriminatory admissions." *Muniz*, 496 U.S. at 602 n. 14, 110 S.Ct. 2638. The difference between permissible follow-up questions and impermissible interrogation clearly turns on whether the police are seeking clarification of something that the suspect has just said, or whether instead the police are seeking to expand the interview. See, e.g., WAYNE R. LAFAVE ET AL., 2 CRIMINAL PROCEDURE § 6.7(a), at 567 (2d ed. 1999) ("the part of defendant's statement given after the follow-up questions is volunteered only if the questions are neutral efforts to clarify what has already been said rather than apparent attempts to expand the scope of the statement previously made.").

594 F.3d 900, 921 (6th Cir. 2010).

{¶37} Applying *Tolliver's* guidelines, we do not find that it was reasonably likely that a responsive answer to the question could only have been incriminating. The officers' question concerning the gun in the case at bar was a legitimate part of their investigation into the circumstances surrounding the apparent suicide of D.H. In other words, the question "where did the gun come from" was not "express questioning or its functional equivalent," i.e. not words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response, such that no *Miranda*

violation occurred when Sargent Gordon asked the question without first *Mirandizing* Taylor.

{¶38} Accordingly, because Taylor was neither "in custody" nor subject to "interrogation," the officers' were not required to administer *Miranda* warnings.

{¶39} Taylor's sole assignment of error is overruled.

{¶40} The judgment of the Richland County Court of Common Pleas is affirmed.


By Gwin, P.J.,

Baldwin, J., and

Wise, Earle, J., concur